UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DONALD LEE CURTIS,

                                Plaintiff,
                                                        9:15-CV-00718
v.                                                      (GLS/TWD)

R. BOLA and D.G. DUBREY,
                                Defendants.
_____

APPEARANCES:                          OF COUNSEL:

DONALD LEE CURTIS
86-A-3111
Plaintiff pro se
Five Points Correctional Facility
Caller Box 119
Romulus, New York 14541


HON. ERIC T. SCHNEIDERMAN          JUSTIN L. ENGEL, ESQ.
Attorney General for the State of New York    Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

                **ORDER AND REPORT AND RECOMMENDATION**

I.    **INTRODUCTION**

        Pro se Plaintiff Donald Lee Curtis is an inmate in the custody of the New York

Department of Corrections and Community Supervision ("DOCCS"), currently housed at Five

Points Correctional Facility.  Plaintiff commenced this civil rights action pursuant 42 U.S.C. §

1983 on June 11, 2015.  (Dkt. No. 1.)  The allegations in the complaint relate to Plaintiff's

previous confinement at Clinton Correctional Facility ("Clinton").  *Id.*

Upon initial review under 28 U.S.C. §§ 1915(e) and 1915A, Plaintiff was found by the Hon. Gary L. Sharpe, Senior District Judge, to have alleged enough to require a responsive pleading against Defendants R. Bola ("Bola"), a civilian food services worker at Clinton, and Clinton Corrections Officer D.G. DuBrey ("DuBrey") for violation of his rights under the First Amendment Free Exercise Clause, and retaliation in violation of his First Amendment rights; and against DuBrey for violation of his rights under the Eighth Amendment in connection with the alleged tampering with Plaintiff's food and water.  (Dkt. No. 5 at 10, 12, 20-21.)

Defendants Bola and DuBrey now seek summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that Plaintiff has failed to exhaust his administrative remedies.  (Dkt. No. 29.)  Plaintiff has responded to the motion (Dkt. No. 31) and Defendants have filed reply papers.  (Dkt. No. 32.)

## II.    FACTUAL BACKGROUND

### A.    Facts Underlying Plaintiff's Free Exercise and Retaliation Claims

Plaintiff is Jewish and follows Kosher dietary laws.  (Dkt. No. 29-16 at 11.)  In early January 2014, Defendant DuBrey began serving Kosher meals in the mess hall.[1]  *Id*. at 49. DuBrey served the meals without wearing gloves.  *Id*. at 12.  DuBrey refused Plaintiff's requests to wear gloves.  (Dkt. Nos. 1-1 at ¶¶ 18, 20, 22-23; 29-16 at 12-15.)   When Plaintiff complained to Defendant Bola, who was tasked with making sure everyone serving food in the mess hall wore gloves, Bola laughed and said that "you Jews are always complaining," and DuBrey could serve the food however he saw fit.  (Dkt. Nos. 1-1 at ¶ 18; 29-16 at 14.)  DuBrey continued

---

[1]  "Kosher meals" and "CAD" (cold alternative diet) are used interchangeably herein.

serving the Kosher food without gloves.  (Dkt. No. 29-16 at 15-16.)

In the early part of January 2014, Plaintiff once again asked DuBrey to use gloves when handling his Kosher food.  (Dkt. No. 1 at ¶ 20.)  DuBrey shoved Plaintiff's Kosher tray at him and told him to "get the fuck away from the counter."  *Id*.  Plaintiff refused to take the tray and went back to his cell and wrote a letter to David Timmons ("Timmons"), Food Service Administrator at Clinton, complaining about DuBrey not wearing gloves when he served the Kosher food.[2]  (Dkt. No. 1-1 at ¶ 19.)  Plaintiff continued to argue with DuBrey about wearing gloves every morning in the mess hall.  (Dkt. Nos. 1-1 at ¶¶ 15, 22; 29-16 at 15.)  DuBrey told Plaintiff if he did not like the way he served the food, Plaintiff should get off the Kosher meal list.  (Dkt. Nos. 1-1 at ¶ 23; 29-16 at 15.)

On January 15, 2014, DuBrey continued to serve Plaintiff's Kosher food and cups of hot water without gloves.  (Dkt. No. 1-1 at ¶ 25.)  In his complaint, Plaintiff alleges that at breakfast that morning he drank tea that he had made with the hot water.  (Dkt. No. 1-1 at ¶ 26.)  At his deposition, testified he drank coffee.  (Dkt. No. 29-16 at 19.)  According to Plaintiff, the hot beverage he drank that morning had a strange odor and a taste he was not used to.  (Dkt. Nos. 1-1 ¶ 26; 29-16 at 18.)  When Plaintiff got back to his cell he felt ill all of a sudden.  (Dkt. Nos. 1-1 ¶ 27; 29-16 at 19.)  His body was covered with welts, and his legs and ankles became swollen.  *Id*.

_____

[2]  Plaintiff's letter to Timmons does not appear to be part of the summary judgment record.  Timmons' January 14, 2014, memorandum in response indicates that Plaintiff's letter was dated January 6, 2014.  (Dkt. No. 1-3 at 11.)  Timmons did not mention the glove issue in his memorandum.  (Dkt. Nos. 1-1 at ¶ 24; 1-3 at 11.)  The memorandum informed Plaintiff he would have to raise his concerns about an officer who was out to get him off the Kosher list with security.  *Id*.  Timmons also noted that Plaintiff had indicated in his letter that he took food back to his cell and informed him that except for a couple of allowed items, food was not be taken from the mess hall.  *Id.*

That evening, another inmate told Plaintiff that he had tried to tell him that had seen a corrections officer put something in Plaintiff's water before giving it to him.[3]  (Dkt. No. 29-16 at 22.)

The welts and swelling were gone by morning on January 16, 2014, so Plaintiff went to the mess hall for breakfast where he was again served food and hot water by DuBrey.  (Dkt. No. 1-1 at ¶¶ 28-29.)  Plaintiff again complained about DuBrey not wearing gloves.  *Id*. at ¶ 29. When Plaintiff opened his Styrofoam tray, he discovered that someone had messed up the food, and he again noticed that his hot tea had an odor.  *Id*. at ¶ 30.  That evening, Plaintiff again broke out in welts, his feet swelled, and he began to sweat.  *Id*. at ¶ 31.  Plaintiff requested medical attention but was not taken to the facility hospital until the following day.  *Id*.  Plaintiff informed the medical staff he believed that poison or something toxic had been added to his hot water by DuBrey, and that Bola was involved.  *Id*.; Dkt. No. 29-6 at 26.  Plaintiff was given pills and sent back to his cell to rest.  (Dkt. No. 1-1 at ¶ 32.)

Plaintiff continued to be ill with vomiting and excessive bowel movements and was seen at the facility hospital again on January 21, 2014, for the welts and swelling and vomiting and excessive bowel movements.  *Id*. at ¶ 34.  Plaintiff was placed on bed rest and ended up back at the facility hospital on January 24, 2014, with the same ailments.  *Id*. at ¶¶ 34-35; Dkt. No 1-3 at 31.  Plaintiff continued to be ill until he was placed in SHU in March.  (Dkt. Nos. 1-1 at ¶ 37; 1-3

---

[3]  Annexed as Exhibit P to Plaintiff's complaint is a January 15, 2014, statement by another inmate, affirmed pursuant to 28 U.S.C. § 1746, stating that the inmate had seen DuBrey spray cleaning solution into two Styrofoam cups, put hot water in the cups, and give them to Plaintiff at breakfast on January 15, 2014.  (Dkt. No. 1-3 at 42-43.)  According to Plaintiff, he informed the Superintendent of the facility about the statement in a February 27, 2014, letter. (Dkt. No. 1-1 at ¶ 39.)  In a March 6, 2014, letter to DOCCS Commissioner Annucci, Plaintiff wrote that he had not sent the inmate's statement to the Clinton Superintendent in order to protect the identity of the inmate.  (Dkt. No. 1-3 at 39.)

at 33; 29-16 at 53.)

On February 27, 2014, Plaintiff was interviewed by the food service administrator regarding DuBrey not wearing gloves and Plaintiff's suspicion that DuBrey was poisoning him. (Dkt. Nos. 1-1 at ¶ 36; 29-16 at 30.)  After the interview, DuBrey threatened Plaintiff, telling him that if he did not get off the Kosher meal line, he would see to it that some harm came to him. (Dkt. Nos. 1-1 at ¶ 36; 29-16 at 30.)  Plaintiff returned to his cell and wrote a letter of complaint to the Superintendent and Food Service Administrator at Clinton advising them that because of the threats made by DuBrey, Plaintiff was removing himself from the Kosher meal list effective March 4, 2014.  (Dkt. Nos. 1-1 at ¶ 39; 29-16 at 31.)  Plaintiff complained in the letter that DuBrey was ransacking his food and poisoning his hot water, and Plaintiff expressed concern for his life.  (Dkt. Nos. 1-1 at ¶ 39; 29-16 at 30.)  Plaintiff also wrote to DOCCS Commissioner Annucci complaining of the situation regarding his Kosher meals and his belief that he was being poisoned by DuBrey.  (Dkt. No. 1-3 at 37.)

Because he still had not been removed from the Kosher meal list, Plaintiff went to the mess hall to sign off the list on March 9, 2014, when DuBrey was not working.  (Dkt. Nos. 1-1 at ¶¶ 42-43; 1-3 at 44-45.)  Plaintiff went to the regular food line for breakfast on March 10, 2014, and took an empty tray and glass of milk.  (Dkt. No. 1-1 at ¶ 45.)  DuBrey and Bola came over, asked for Plaintiff's I.D., and told him he was supposed to be in the Kosher line.  *Id.*  Another civilian employee and corrections officer told DuBrey and Bola that Plaintiff had signed off of the Kosher list the day before, and that the form was in the office.  *Id.*

According to Plaintiff, he told DuBrey that he had threatened him to get off the Kosher list, and now that Plaintiff had done so, DuBrey was still harassing him.  DuBrey and Bola took

Plaintiff's I.D. and told him to sit down. *Id*. DuBrey and Bola had Plaintiff put in keeplock and issued a misbehavior report stating that Plaintiff had picked up a regular meal in spite of a court order that he must be provided a CAD diet. (Dkt. No. 1-3 at 53.) The March 10, 2014, Tier III misbehavior report states that Plaintiff became loud and boisterous and made statements that DuBrey and Bola were anti-Semitic, causing the other inmates to take notice. *Id*. Plaintiff was charged with 102.10 threats, 104.13 disturbing conduct, 106.10 direct order, and 107.11 harassment. *Id*.

The same day, Plaintiff wrote another letter to the facility Superintendent complaining that he had been placed in keeplock by DuBrey for a CAD violation despite having signed off the Kosher meal list, and that DuBrey had been harassing him since January 2014. (Dkt. No. 1-3 at 46-47.) Plaintiff informed the Superintendent that the CAD meal sent to his cell on March 10, 2014, where he was being held in keeplock, had a smiley face drawn on it. *Id*. at 48. Plaintiff told the Superintendent that the keeplock was nothing but harassment and a retaliatory tactic. *Id*. at 49.

Plaintiff was found guilty on all of the charges at his disciplinary hearing and given two months in SHU with a corresponding loss of privileges. *Id*. at 56. Albert Prack, Director Special Housing/Inmate Disciplinary Program, reviewed the finding of guilt on appeal, and reversed the determination of guilt on May 27, 2014, after Plaintiff had already spent the two months in SHU. *Id*. at 68; Dkt. No. 29-16 at 72-73. By the time of Prack's determination, Plaintiff had been placed in involuntary protective custody because his signature had been forged on threatening

letters written against facility staff.[4]  (Dkt. No. 1-4 at 19.)

In June 2014, Plaintiff wrote letters to a Clinton County Assistant District Attorney, a New York State Police Captain, and the United States Attorney for the Northern District of New York asking that DuBrey be criminally charged for poisoning him, and complaining about having been falsely charged by DuBrey on March 10, 2014, and placed in cell confinement, and conspiring with others to forge Plaintiff's signature on a threatening letter.  (Dkt. No. 1-4 at 24-35.)

**B.      Plaintiff's Grievances**

Plaintiff filed two grievances related to his claims against DuBrey and Bola.  In Grievance No. CL-65155-14, dated February 9, 2014, Plaintiff complained that his Kosher meals and hot water and cups were being handled and served by un-gloved, non-inmates.  (Dkt. No. 1-3 at 16-26.)  Plaintiff also complained in the grievance that poison or a caustic cleaning solution had been being placed in his hot water since January 15, 2014.  *Id.*  The Superintendent rendered a decision on the grievance on March 5, 2014.  *Id.* at 27.

The Superintendent's decision attached as an exhibit to Plaintiff's complaint shows that Plaintiff signed the appeal statement on the bottom of the decision on March 6, 2010.[5]  *Id.* Plaintiff stated that he was appealing to the Central Office Review Committee ("CORC")

---

[4]  On March 13, 2014, while Plaintiff was in SHU, a misbehavior report was issued against him for allegedly sending a facility education supervisor a note which read "I'll kill you bitch."  (Dkt. No. 1-4 at 7.)  The charges were dismissed when the signature on the note was determined not to belong to Plaintiff.  (Dkt. Nos. 1-4 at 9; 29-16 at 54.)

[5]  The copy of the Superintendent's March 5, 2014, decision submitted in support of Defendants' motion for summary judgment does not contain the appeal statement to CORC. (Dkt. No. 29-8 at 2.)

because the Superintendent's decision was an attempt to cover up wrongdoing; the grievance was not, as the decision suggested, about his being harassed by a food service administrator but was clearly about his meals being tampered with and food being poisoned by DuBrey and Bola, causing him to be sick; and that Plaintiff had been threatened with physical harm if he did not get off the CAD diet. *Id*. at 28-29.

Plaintiff confirmed that Grievance No. CL-65155-14 was about DuBrey and Bola at his deposition. (Dkt. No. 29-16 at 61.) Plaintiff testified at his deposition that he had appealed the Superintendent's decision to CORC, but that all of the grievances concerning DuBrey, and only grievances against DuBrey, that he had appealed to CORC had disappeared. *Id*. at 63, 65.

According to Plaintiff's testimony, he has appealed every grievance he filed to CORC. *Id*. When asked to explain the filing procedure, Plaintiff testified that he would fill out the appeal statement section of the Superintendent's decision, sign and date it, seal it and address it to the Internal Grievance Resolution Committee ("IGRC"), and put it up in the mailbox. *Id*. at 64.

In Grievance No. CL-65307-14, dated March 10, 2014, Plaintiff referenced Grievance No. CL-65155-14, which he described as having complained of staff serving CAD meals and hot water without gloves, and DuBrey and Bola tampering with his CAD meals and putting caustic cleaning solution in his food and hot water. (Dkt. No. 29-7 at 2.) Plaintiff complained that DuBrey threatened him harm if he did not get off CAD, and then when he did, DuBrey wrote him up for receiving regular food even after Plaintiff informed him that the sign off form with his signature was in the kitchen. *Id*. at 5. Plaintiff also complained in the grievance that DuBrey's March 10, 2014, false misbehavior report constituted retaliation. *Id*. at 6.

Grievance No. CL-65307-14 was denied by the Superintendent in a decision dated March 25, 2014.  (Dkt. No. 1-3 at 52.)  The signed appeal statement appealing to CORC, dated March 26, 2014, attached as an exhibit to Plaintiff's complaint,[6] states "I appeal on the same grounds as stated in the grievance because the retaliation is clearly obvious and all code 49 decisions are partial to DOCCS employees."  *Id.*  Plaintiff testified at his deposition that he had appealed the Superintendent's decision on Grievance No. CL-65307-14 to CORC.  (Dkt. No. 29-16 at 69.)

According to Plaintiff, having received no response from CORC on his appeal of Grievance No. CL-65155-14, he "smelled a rat" and checked with the Inmate Grievance Program ("IGP") Supervisor.[7]  (Dkt. No. 1-1 at ¶ 66.) The IGP Supervisor, C. Gregory, in an August 4, 2014, memorandum, informed Plaintiff that no CORC appeal to his grievance had been received, and it was beyond the time frame to appeal to CORC.  (Dkt. No. 1-4 at 53.)

The following day, Plaintiff filed Grievance No. CL-65890-14, dated August 5, 2014, complaining that his grievances were being tampered with and destroyed by the IGP staff as well as other facility staff.  (Dkt. No. 29-11 at 2.)  Plaintiff stated in the grievance that his appeal on Grievance No. CL-65155-14 had disappeared and accused the IGP staff of destroying it.  *Id.* Plaintiff also complained that he had not yet received a decision on Grievance No. CL-65307-14, which is inconsistent with the Superintendent's decision on the grievance, dated March 25, 2014, and Plaintiff's March 26, 2014, appeal statement submitted by Plaintiff as an exhibit to his

---

[6]  The copy of the Superintendent's March 25, 2014, decision submitted in support of Defendants' motion for summary judgment does not contain the appeal statement to CORC. (Dkt. No. 29-9 at 2.)

[7]  At his deposition, Plaintiff was shown an August 3, 2014, letter to the IGRC inquiring about a grievance decision involving DuBrey.  (Dkt. No. 29-16 at 74.)

complaint, and his deposition testimony. (Dkt. Nos. 1-3 at 52; 29-16 at 69.)

The IGRC issued a decision finding that no CORC appeals had been filed on the two grievances on August 13, 2014. (Dkt. No. 29-12 at 2.) The Acting Superintendent issued a decision on Grievance No. CL-65890-14 upholding the IGRC decision on September 5, 2014. (Dkt. No. 29-13 at 2.) He found that a decision had been issued on Grievance No. CL-65307-14 on March 25, 2014, and that no appeal to CORC had been received and no inquiry as to the status had been received from Plaintiff. *Id*. The decision acknowledged that Plaintiff had inquired as to the status of Grievance No. CL-65115-14, and that a status report had been issued on August 4, 2014. *Id*. The Superintendent noted that the staff had denied destroying Plaintiff's grievance complaints. *Id*. CORC upheld the decision on appeal. (Dkt. No. 29-14 at 2.)

In addition to filing the grievance, Plaintiff wrote to Karen Bellamy ("Bellamy"), DOCCS IGP Director, on August 5, 2014. (Dkt. No. 1-4 at 55-57.) Plaintiff wrote to Bellamy to complain about Clinton IGP Supervisor Gregory purposefully destroying his Code 49 appeals to CORC and withholding decisions on his Code 49 grievances which he had against DuBrey. (Dkt. No. 1-4 at 55.) Plaintiff specifically addressed his appeal to CORC on Grievance No. CL-65155-14. *Id*. According to Plaintiff, he sent his CORC appeal on the grievance to Gregory and retained a copy, and Gregory claimed that the appeal was never received. *Id*. In the letter, Plaintiff repeated his claim that he had not received a decision on Grievance No. CL-65307-14. *Id*. at 56.

Bellamy responded to Plaintiff's letter on August 12, 2014. *Id*. at 58. Bellamy wrote that contact with Clinton administration revealed that Plaintiff did not submit appeals for Grievance Nos. CL-65155-14 and Cl-65307-14. *Id*. Bellamy noted that Grievance No. CL-65890-14,

dealing with the appeal issue, was pending, and she advised Plaintiff that DOCCS Directive #

4040 made no provision for an inmate to refer grievances directly to Central Office.  *Id.*  Bellamy

told Plaintiff that grievance concerns should be addressed to the IGP Supervisor for the most

expeditious resolution.  *Id.*

Defendants have submitted the Declaration of Assistant Director of the DOCCS IGP,

Jeffrey Hale ("Hale"), who conducted a search of the CORC database for records of appeals to

CORC on Grievance Nos. CL-65155-14 and CL-65307-14.  (Dkt. No. 29-4 at ¶¶ 1, 14.)

According to Hale, his search revealed that Plaintiff never appealed either of the grievances to

CORC, nor did he appeal any other grievance complaining of his Kosher meals being poisoned

or retaliation at Clinton between January and March 2014.  *Id.*  Plaintiff does not dispute that he

commenced this action on June 11, 2015, without CORC having issued decisions on Grievance

Nos. CL-65155-14 and Cl-65307-14 and, as discussed above, claims that his appeals to CORC of

those grievances were destroyed.

## III.    APPLICABLE SUMMARY JUDGMENT LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together

"show that there is no genuine issue of material fact and that the moving party is entitled to

judgment as a matter of law." Fed.R.Civ.P. 56; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 251-52 (1986).  The party moving for summary judgment bears the initial burden of

showing, through the production of admissible evidence, that no genuine issue of material fact

exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A dispute of fact is

"genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit.[8] *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

In *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." "To defeat summary judgment, . . . nonmoving parties "may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys*, 426 F.3d at 554 (citation and internal quotation marks omitted). "At the summary judgment stage, a

---

[8] The Court finds that Plaintiff's complaint this case was adequately verified under 28 U.S.C. § 1746 by the language "'[p]ursuant to 28 USC § 1746, Plaintiff verifies and affirms under the penalties that all the above is true to his knowledge and belief." (Dkt. No. 1-1 at 42.)

nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id*. (citation and internal quotation marks omitted). "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations. "*Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999)[9] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## IV.    ANALYSIS

### A.    Plaintiff's Failure to Respond to Defendants' Statement of Material Facts

While courts are required to give due deference to a plaintiff's pro se status, that status "does not relieve [a pro se] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003).

_____

[9] Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

In opposing Defendants' summary judgment motion, Plaintiff failed to respond to the Statement of Material Facts filed by Defendants in the manner required under N.D.N.Y. L.R. 7.1(a)(3).[10] Where, as in this case, a party has failed to respond to the movant's statement of material facts in the manner required under N.D.N.Y. L.R. 7.1(a)(3), the facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record,[11] and (2) the nonmovant, if proceeding pro se, has been specifically advised of the possible consequences of failing to respond to the motion.[12] *See Champion,v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). However, the Second Circuit, acknowledging a court's broad discretion to determine whether to overlook a failure to comply with local rules, has held that "while a court is not required to consider what the parties fail to point out in their [local rule statements of material facts], it may in its discretion opt to conduct an assiduous review of the entire record even where one of the parties has failed to file such a statement." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted). In deference to Plaintiff's pro se

---

[10] L.R. 7.1(a)(3) requires the opposing party to file a response to the movant's Statement of Material Facts. Under the rule, the response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises."

[11] L.R. 7.1(a)(3) provides that "<u>The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert</u>." However, *see Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

[12] Defendants have complied with L.R. 56.2 by providing Plaintiff with the requisite notice of the consequences of his failure to respond to their summary judgment motion. (Dkt. No. 29 at 3.)

status, the Court has opted to review the entire record in determining if there are material facts in dispute.

**B.**     **Exhaustion of Administrative Remedies**

    1.     <u>Legal Standard for Exhaustion</u>

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). In New York state prisons, DOCCS has a well-established IGP. N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5 (2013).

Generally, the DOCCS IGP involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. *Id.* at § 701.5(a) (2010). A representative of the facility's IGRC has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance (*Id*. at § 701.5(b)(2)), and issues a written decision within two working days of the conclusion of the hearing. *Id*. at § 701.5(b)(3).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. *Id*. at § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id*. at § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to CORC for a decision under the process applicable to the third step. *Id*. at § 701.5(c)(3)(i).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id*. at 701.5(d)(1)(i). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id*. at 701.5(d)(3)(ii). If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford*, 548 U.S. at 93. Because failure to exhaust is an affirmative defense, defendants bear the burden of showing by a preponderance of the evidence that a plaintiff has failed to exhaust his available administrative remedies. *See Murray v. Palmer*, No. 9:03-CV-1010 (GTS/GHL), 2010 WL 1235591, at *4 (N.D.N.Y. Mar. 31, 2010); *Bailey v. Fortier,* No. 09-CV-0742 (GLS/DEP), 2012 WL 6935254, at *6 (N.D.N.Y. Oct. 4, 2012) (the party asserting failure to exhaust bears the burden of proving its elements by a preponderance of the evidence).

A prisoner's failure to exhaust, however, does not end a court's exhaustion review. For more than ten years, courts in this district were guided by the Second Circuit's decision in *Hemphill v. New York*. 380 F.3d 680, 686 (2d Cir. 2004). Under *Hemphill*, the Second Circuit established a three-part inquiry to determine whether, *inter alia*, a plaintiff's failure to exhaust

available administrative remedies could nevertheless be justified by "special circumstances."[13]

*Id*. However, on June 6, 2016, the Supreme Court rejected the "special circumstances" exception applied by many circuits, and held that "[c]ourts may not engraft an unwritten 'special circumstance' onto the PLRA's exhaustion requirement." *Ross v. Blake*, ___ U.S. ___, 136 S.Ct. 1850, 1862 (2016). In *Ross*, the question before the Court was whether there is a "special circumstances" exception under the PLRA when the inmate erroneously believed that he had satisfied the exhaustion requirement. *Id*. at 1855. In an opinion by Justice Elena Kagan, the Supreme Court held that there is no such exception:

> the [PLRA] mandates that an inmate exhaust "such administrative remedies as are available" before bringing suit to challenge prison conditions. The court below adopted an unwritten "special circumstances" exception to that provision, permitting some prisoners to pursue litigation even when they have failed to exhaust available administrative remedies. Today, we reject that freewheeling approach to exhaustion as inconsistent with the PLRA.

*Id*. at 1854-55. (internal citation omitted).

The Supreme Court rejection of the "special circumstances" exception still does not end a court's review "because the PLRA contains its own, textual exception to mandatory exhaustion." *Id*. at 1858. Under the PLRA, "the exhaustion requirement hinges on the 'availab[ility]' of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Id*. Thus, courts are still tasked with determining whether or not a

---

[13] Generally, the "special circumstances" exception was applied where a prisoner has been threatened with physical retaliation for exhausting administrative remedies or where the prisoner reasonably misinterpreted the statutory requirements of the appeals process. *Giano v. Goord*, 380 F.3d 670, 676 (2d Cir. 2004), *abrogated by Ross v. Blake*, ___ U.S. ___, 136 S.Ct. 1850 (2016).

prisoner's administrative remedies are, in fact "available."

To guide courts in this analysis, the Supreme Court identified "three kinds of circumstances" in which an administrative remedy, "although officially on the books," is not "available." *Id*. at 1853. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end    with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id*. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id*. at 1853-54. Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*.

2.      Analysis of the Exhaustion Issue

In support of their motion for summary judgment, Defendants have submitted evidence that DOCCS records reveal that no appeals from Grievance Nos. CL-65155-14 and Cl-65307-14 were filed with CORC. (Dkt. Nos. 29-4 at ¶ 14; 29-10 at 2-5.) Defendants have also submitted copies of the Superintendent's decisions on both grievances on which the appeal statement is blank to show that Plaintiff did not appeal to CORC (Dkt. Nos. 29-8 at 2; 29-9 at 2), and the IGRC's, Superintendent's, and CORC's decisions on Grievance No. CL-65890-14 finding that Plaintiff did not appeal to CORC on Grievance Nos. CL-65155-14 and Cl-65307-14, and that there was no malfeasance on the part of staff. (Dkt. Nos. 29-12 at 2; 29-13 at 2; 29-14 at 2.)

In addition, Defendants have submitted Plaintiff's deposition testimony in which he testified that he had filed appeals with CORC on Grievance Nos. CL-65155-14 and Cl-65307-14. (Dkt. No. 29-16 at 63, 69). Plaintiff has alleged in his verified complaint that he sent an appeal

to CORC on Grievance No. 65155-14 to the IGRC via the mailbox and never received a response. (Dkt. No. 1-1 at ¶ 66.) Plaintiff has submitted as exhibits to his complaint copies of the Superintendent's decisions on Grievance Nos. CL-65155-14 and Cl-65307-14 which include signed and dated appeal statements. (Dkt. No. 1-3 at 27, 52.) Plaintiff also made status inquiries regarding his appeal to CORC on Grievance No. 65155-14 to both IGP Supervisor Gregory and Director Bellamy and filed a grievance complaining of the destruction of his appeals to CORC on grievances involving DuBrey. (Dkt. Nos. 1-4 at 53, 55-57; 29-11 at 2.)

When questions of fact and issues of credibility exist regarding the failure to exhaust administrative remedies, a court should neither engage in fact finding nor make determinations as to credibility in addressing a defendant's motion for summary judgment for failure to exhaust. *See, e.g., White v. Clark*, No. 9:12-CV-986 (NAM/DJS), 2016 U.S. Dist. LEXIS 17689, at * 16-18 (N.D.N.Y. Feb. 11, 2016)[14] (finding that assessments of credibility are not proper on summary judgment and disputed issues of material fact had to await an exhaustion hearing); *Nelson v. Plumley*, No. 9:12-CV-422 (TJM/DEP), 2014 WL 4659327, at * 13 (N.D.N.Y. Sept. 17, 2014) (denial of summary judgment and referral for an exhaustion hearing where issues of fact were found in the question of exhaustion); *Bailey*, 2010 WL 4005258, at *7 and n.7 (summary judgment not appropriate where genuine issues of fact exist as to whether plaintiff was precluded from exhausting administrative remedies by the actions of prison officials ); *Collins v. Goord*, 438 F. Supp. 2d 399, 414 (S.D.N.Y. 2006) (summary judgment denied where plaintiff's submissions found sufficient to raise an issue of fact on whether the IGP process was, in fact,

---

[14] There is no Westlaw cite for this Report-Recommendation, nor is it contained in the official reporters.

"available" to him).

As discussed above, in *Ross*, an administrative procedure, "although officially on the books," is not "available" when prison administrators thwart an inmate from taking advantage of the grievance process through "machination, misrepresentation, or intimidation." 136 S.Ct. at 1853-55. The Court finds that Plaintiff's claim that all of his appeals to CORC on grievances involving DuBrey were destroyed by the IGP Supervisor or his staff, or facility staff, rather than sent to CORC for review, raises an issue as to the "availability" of the DOCCS IGP. Moreover, the Court finds that there are material issues of fact on the issue of availability of the DOCCS IGP with respect to Grievance Nos. CL-65155-14 and Cl-65307-14.

Given the finding that there are material issues of fact in dispute, the Court is unable to determine as a matter of law on this motion whether Plaintiff has exhausted his administrative remedies in this case. Therefore, the Court recommends that Defendants' motion for summary judgment be denied, and that an evidentiary hearing in which the exhaustion issue can be determined as a matter of law be ordered by the District Court.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 29) be **DENIED**; and it is further

**RECOMMENDED** that the District Court direct that this matter be scheduled for an evidentiary hearing on the issue of exhaustion of administrative remedies; and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file

written objections to the foregoing report.  Such objections shall be filed with the Clerk of the

Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C.

§ 636(b)(1); Fed. R. Civ. P. 72.


Dated: November 1, 2016
       Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

2012 WL 6935254
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Everton BAILEY, Plaintiff,
v.
M. FORTIER, Defendant.

Civ. Action No. 9:09–CV–0742 (GLS/DEP).
|
Oct. 4, 2012.

**Attorneys and Law Firms**

Hancock Estabrook LLP, Michael J. Sciotti, Esq., Robert
Thorpe, Esq., of Counsel, Syracuse, NY, for Plaintiff.

Hon. Richard S. Hartunian, United States Attorney,
Charles E. Roberts, Esq., Assistant U.S. Attorney, of
counsel, Syracuse, NY, for Defendant.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Everton Bailey, a federal prison inmate,
has commenced this *Bivens* [1] action against defendant
Michelle Fortier, a corrections officer stationed at the
prison facility in which Bailey was confined at the
relevant times, alleging deprivation of his civil rights.
Bailey's claims are based upon Fortier's alleged failure
to protect him from an assault by a cellmate, despite having
registered prior complaints expressing fear for his safety.

Currently at the forefront of the action is the threshold
question of whether Bailey, who admits that he did not file
a grievance following the procedures in place at Bureau
of Prisons ("BOP") facilities, should be excused from the
requirement of exhausting administrative remedies before
commencing suit due to the alleged refusal of prison
officials to provide him with the forms necessary to file
a grievance. Because I find, based upon an evidentiary
hearing conducted, that Bailey was not prevented by the
actions of prison officials from filing a grievance regarding
his claim against Fortier, and that he has offered no special
circumstances providing a basis to excuse his failure to
exhaust administrative remedies, I recommend that his

complaint be dismissed on this procedural basis, without
addressing its merits.

I. *BACKGROUND*

Bailey is a federal prison inmate currently being held in
the custody of the BOP as a result of a 2007 criminal
conviction entered in the United States District Court
for the Eastern District of Pennsylvania. *See generally*
Complaint (Dkt. No. 1); *see also* VanWeelden Decl. (Dkt.
No. 10–4) ¶ 5; June 20, 2012 Hearing Transcript (Dkt.
No. 44) at p. 84. [2] While he is presently housed in another
BOP facility, at times relevant to this litigation Bailey
was designated by the BOP to the Ray Brook Federal
Correctional Institution ("FCI Ray Brook"), located in
Ray Brook, New York. *Id.*

On the morning of February 23, 2009, while housed in a
six-person cell in the Mohawk Housing Unit at FCI Ray
Brook, Bailey was confronted and physically assaulted by
one of his cellmates after being accused of stealing that
inmate's prayer oil. Complaint (Dkt. No. 1) ¶¶ 8–9; *see
also* VanWeelden Decl. (Dkt. No. 10–4) Exh. D. Bailey
reported the incident to Fortier, and requested that he be
moved to another cell. Complaint (Dkt. No. 1) ¶ 10. That
request was denied, and Bailey was directed by Fortier to
return to his cell in light of an impending inmate count.
*Id.* at ¶ 11.

Following the inmate count, Bailey again was accosted by
the same inmate, who on this occasion threw hot oil from a
ceramic mug onto his face. [3] Complaint (Dkt. No. 1) ¶ 13;
VanWeelden Decl. (Dkt. No. 10–4) Exh. D; Tr. 100, 145.
Bailey suffered second degree burns to his face resulting
in his being hospitalized at an outside medical facility for
a period of fourteen days. Complaint (Dkt. No. 1) ¶¶ 13–
14; Tr. 32, 84–85. Upon his return to FCI Ray Brook,
Bailey was placed in a special housing unit ("SHU") cell,
where he remained until he was transferred to another
BOP facility. Tr. 59–60, 85.

**\*2** The BOP has established an Administrative
Remedy Program ("ARP"), comprised of a four-step
administrative process through which inmates can seek
formal internal review of any complaint regarding any
aspect of their imprisonment. Tr. 10; 28 C.F.R. § 542.10
*et seq.; see also Macias v. Zenk,* 495 F.3d 37, 42
(2d Cir.2007). In accordance with the established ARP
protocol, an inmate must first attempt informal resolution

of his or her complaint by presenting the issue informally to staff, and staff must attempt to resolve the issue. 28 C.F.R. § 542.13(a); *see also Johnson v. Testman,* 380 F.3d 691, 693 (2d Cir.2004). This informal, initial procedure typically begins with the filing of a "cop-out," which can be submitted either on a BP–8 form available to inmates through several sources, including their assigned counselors, or on paper of any other description. Tr. 10, 22, 27, 66–67, 129, 142.

If the complaint cannot be resolved informally, the inmate may next submit a formal written Administrative Remedy Request ("ARR") to the warden of the facility, utilizing a BP–9 form, within twenty calendar days of the event that generated the inmate's complaint. [4] Tr. 22, 32, 44; 28 C.F.R. § 542.14(a); *see also Johnson,* 380 F.3d at 693. That twenty-day period, however, can be extended in appropriate circumstances. [5] Tr. 33, 54, 144. If that formal request is denied, the inmate may next appeal the matter to the appropriate BOP Regional Director, utilizing a BP–10 form, within twenty calendar days of the date the grievance is denied by the facility warden. Tr. 22; 28 C.F.R. § 542.15(a); *see also Johnson,* 380 F.3d at 693. An unfavorable decision from the Regional Director can then be appealed to the General Counsel's office, utilizing a BP–11 form, within twenty calendar days of the date of the Regional Director's response. Tr. 22; 28 C.F.R. § 542.15(a).

Despite the existence of the ARP, Bailey did not avail himself of that process by filing a grievance regarding the assault or the defendant's alleged failure to protect him from it. Tr. 101–02, 106. Bailey claims that he requested the appropriate forms for commencing the grievance process from several prison workers, including Hawley Snyder, Barbara Darrah, and the warden at FCI Ray Brook. Tr. 86–88, 91, 93–95, 107–09. Employees at FCI Ray Brook, however, uniformly testified that Bailey never requested the appropriate grievance forms from them. *See* Tr. 72, 131, 146–47, 153, 155, 168; *see also* Tr. 49 (Robin Van Weelden); 161 (Jean Marie Diehl); 166 (Michelle Gonyea). I credit the testimony of defendant's witnesses and find that Bailey failed to ask his corrections counselor, or any other BOP employee at FCI Ray Brook, for the necessary forms to commence the grievance process.

The record also reflects that Bailey had abundant opportunity to secure the necessary grievance forms. In February and March of 2009, he was assigned a unit

team that included Barbara Darrah, his unit manager; Michelle Gonyea, a case worker; Hawley Snyder, his assigned corrections counselor; and one other corrections counselor. [6] Tr. 46, 86, 140–41. Members of Bailey's unit team, particularly his corrections counselor, were in frequent contact with him. *See, e.g.,* Tr. 126, 129–30, 140–41, 165.

**\*3** Various other BOP officials were also in regular contact with Bailey, making periodic rounds of the FCI Ray Brook SHU. Tr. 35. For example, at the times relevant to this litigation, the facility's warden typically visited the SHU every Wednesday morning, normally accompanied by Robin Van Weelden, who in February 2009 served as a legal assistant, as well as one or two associate wardens, a corrections captain, and unit team members. Tr. 35, 55. When making those rounds the group would proceed from cell to cell, knocking on doors and asking whether an inmate in a particular cell wished to voice any needs. Tr. 57. In addition, Barbara Darrah, as a unit manager, was required to visit inmates in the SHU twice weekly, although she testified that she was in that portion of the facility "pretty much daily." Tr. 126. When visiting the SHU, Darrah generally carried with her a folder of various forms, including BP–8, BP–9, BP–10, BP–11 and cop-out forms, earning her the nickname "the form lady." Tr. 70–71, 120, 124–27, 131. Like the warden and the warden's group, when visiting the SHU facility Darrah normally would proceed from cell-to-cell. Tr. 128. Similarly Michelle Gonyea, as plaintiff's case manager during February and March of 2009, was required to visit the SHU at least once weekly. Tr. 165.

Despite all of those visits and requests as to whether he needed anything, Bailey did not ask any of those individuals for the forms necessary to grieve Fortier's alleged failure to protect him from harm. Tr. 161–62, 166, 49–50, 72, 132, 144, 154–55, 161, 166.

As previously indicated, plaintiff was absent from FCI Ray Brook receiving outside treatment for his injuries during the fourteen-day period immediately following the inmate assault. In accordance with FCI Ray Brook policy requiring visits by prison officials to any inmate hospitalized for more than five days, Darrah, as plaintiff's unit manager, visited him in or about March of 2009, while he was a patient at the Adirondack Medical Center in Saranac Lake, in order to insure that his needs were being

met. Tr. 133. When asked on that occasion whether he needed anything, Bailey replied, "No." [7] *Id.*

## II. *PROCEDURAL HISTORY*

Bailey commenced this action on June 29, 2009. Dkt. No. 1. His complaint identifies Corrections Officer M. Fortier as the sole named defendant, and alleges that she violated his constitutional rights by failing to protect him from foreseeable harm. *Id.*

On January 8, 2010, prior to answering, Fortier moved to dismiss Bailey's complaint for failure to state a claim upon which relief may be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure or, alternatively, for summary judgment pursuant to Rule 56. Dkt. No. 10. The sole basis for Fortier's motion was her contention that Bailey's complaint is subject to dismissal based upon his failure to exhaust available administrative remedies before commencing suit, as required under 42 U.S.C. § 1997e(a). That motion resulted in my issuance of a report on August 30, 2010, recommending that the motion be denied, based upon the existence of genuine disputes of material fact to be resolved before addressing whether a proper basis for excusing the governing exhaustion requirement had been demonstrated. Dkt. No. 19. That recommendation was adopted by Chief District Judge Gary L. Sharpe on October 12, 2010. Dkt. No. 21.

**\*4** Following the issuance and acceptance of my report and recommendation, the parties were afforded the opportunity to engage in discovery, and a scheduling order was entered requiring, *inter alia,* that any additional dispositive motions be filed on or before October 3, 2011. *See* Dkt. No. 23. All deadlines under that scheduling order have passed, without the filing of any additional motions, and the case is now trial-ready. In light of the existence of a threshold procedural issue regarding exhaustion, the matter was referred to me for the purpose of conducting an evidentiary hearing, pursuant to *Messa v. Goord,* 652 F.3d 305 (2d Cir.2011), in order to develop the record concerning Bailey's efforts to satisfy his exhaustion requirement. *See* Text Entry 11/02/11. That hearing was conducted on June 20, 2012, *see* Text Entry 6/20/12, and, following the close of the hearing, decision was reserved pending briefing by the parties. [8], [9]

## III. *DISCUSSION*

### A. *Governing Legal Principles*

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006); *Hargrove v. Riley,* No. CV–04–4587, 2007 WL 389003, at \*5–6 (E.D.N.Y. Jan.31, 2007). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002). An inmate plaintiff's complaint is subject to dismissal if the evidence establishes that he or she failed to properly exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04–CV–0471, 2006 WL 2639369, at \*1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94–95, 126 S.Ct. at 2387–88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias,* 495 F.3d at 43 (citing *Woodford* ). Complete exhaustion has not occurred, for purposes of the PLRA, until all of the steps of that available process have been taken. *Macias,* 495 F.3d at 44; *see also Johnson v. Rowley,* 569 F.3d 40, 45 (2d Cir.2009); *Strong v. Lapin,* No. 90–CV–3522, 2010 WL 276206, at \*4 (E.D.N.Y. Jan.15, 2010) ("Until the BOP'S Central Office considers the appeal, no administrative remedy is considered to be fully exhausted.").

**\*5** In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted in the event of a failure to satisfy the PLRA's exhaustion requirement. *Macias,* 495 F.3d at 41; *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). Under the prescribed rubric, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times. *Macias,*

495 F.3d at 41; *Hemphill,* 380 F.3d at 686. If such a remedy existed and was available, the court must next examine whether the defendant should be deemed to have forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through the defendant's own actions preventing the plaintiff from exhausting otherwise available remedies, he or she should be estopped from asserting failure to exhaust as a defense. *Id.* In the event the proffered defense survives these first two levels of scrutiny, the court must then determine whether the plaintiff has established the existence of special circumstances sufficient "to justify the failure to comply with applicable administrative procedural requirements.[10],[11] *Id.*

### B. *Burden of Proof*

Before applying the foregoing legal principles, I must first consider who bears the burden of proof, and whether that burden shifts throughout the analysis prescribed under *Hemphill.*

As an affirmative defense, *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007), exhaustion is a claim upon which the party asserting it typically bears the ultimate burden of proving its essential elements by a preponderance of the evidence. *Soria v. Girdich,* No. 9:04–CV–727, 2007 WL 4790807, at *2 (N.D.N.Y. Dec. 2007) (DiBianco, M.J.) (citing *McCoy v. Goord,* 255 F.Supp.2d 233, 247 (S.D.N.Y.2003)); *McEachin v. Selsky,* No. 9:04–CV–83(FJS/RFT), 2005 WL 2128851, at *4 (N.D.N.Y. Aug.30, 2005) (Scullin, C.J.) (citing *Howard v. Goord,* No. 98–CV–7471, 1999 WL 1288679, *3 (E.D.N.Y. Dec. 28, 1999)), *aff'd in part, vacated in part,* 225 F. App'x 36 (2d Cir.2007). The issue is somewhat complicated, however, by consideration of the three-part analysis mandated by *Hemphill* and related cases because that line of cases incorporates concepts—such as estoppel, for example—that typically require the party asserting them to bear the ultimate burden of proof. *See e.g., Abbas v. Dixon,* 480 F.3d 636, 642 (2d Cir.2007) ("The plaintiff bears the burden of showing that the action was brought within a reasonable period of time after the facts giving rise to the equitable tolling or equitable estoppel ...."); *In re Heflin,* 464 B.R. 545, 554 (D.Conn.2011) ("The burden of providing every element of an estoppel is upon the party seeking to set up the estoppel.") (citing *Comm'r v. Union Pac. R.R. Co.,* 86 F.2d 637, 640 (2d Cir.1936)).

**\*6** Also complicating matters is the fact that several courts have held that once a defendant satisfies the burden of demonstrating that an inmate has failed to exhaust administrative remedies, it then becomes incumbent upon the plaintiff to counter with a showing of unavailability, estoppel, or special circumstances. *See, e.g., Murray v. Palmer,* No. 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, at *4 and n. 17 (N.D.N.Y. Mar.31, 2010) (Suddaby, J.); *see also Calloway v. Grimshaw,* No. 9:09–CV–1354, 2011 WL 4345299, at *5 and n. 5 (N.D.N.Y. Aug.10, 2011) (Lowe, M.J.) (citing cases); *report and recommendation adopted,* 2011 WL 4345296 (N.D.N.Y. Sep.15, 2011) (McAvoy, S.J.); *Cohn v. KeySpan Corp.,* 713 F.Supp.2d 143, 155 (E.D.N.Y.2010) (finding that, in the employment discrimination context, defendants bear the burden of establishing the affirmative defense of failure to timely exhaust his administrative remedies, but once defendants have done so, the plaintiff must plead and prove facts supporting equitable avoidance of the defense.). Those decisions, while referencing the burden of proof on an affirmative defense, seem to primarily address an inmate's burden of *production,* or of going forward, to show facts that would form the basis for finding of unavailability, estoppel, or a finding of special circumstances, rather than speaking to the ultimate burden of *persuasion.*

I have been unable to uncover any cases squarely holding that the defendant bears the ultimate burden of proof with regard to all elements of a *Hemphill* analysis. In the final analysis, however, *Hemphill* addresses all of the elements a court is required to consider when analyzing an exhaustion defense. *See Macias,* 495 F.3d at 41 ("In *Hemphill* we "read together" [a series of cases] and formulated a three-part *test* ....") (emphasis added). Therefore, I recommend a finding that, while the burden of production may shift to the plaintiff when a court undertakes a *Hemphill* analysis, the ultimate burden of proof with respect to the exhaustion defense remains, at all times, with the defendant. *See Soria,* 2007 WL 4790807, at *2 ("[A]s with other affirmative defenses, the defendant has the burden of proof to show that plaintiff failed to exhaust his administrative remedies.").

### C. *Application of Governing Legal Principles*

#### 1. *Availability of Administrative Remedy*

In this instance, the question of whether the ARP was available to Bailey is at the heart of the exhaustion

analysis. The hearing testimony confirmed, and Bailey admitted, that at all times relevant to this litigation, there was an inmate grievance procedure in place at FCI Ray Brook. This, however, does not necessarily mean that it was "available" to the plaintiff.

Bailey contends that the grievance process was not available to him in light of the alleged refusal of prison officials to provide him with the forms necessary to file an ARR and pursue the grievance to culmination. Having considered the competing testimony, however, I conclude that Fortier has established, by a preponderance of the evidence, that the forms necessary to pursue a grievance in accordance with the ARP in place at FCI Ray Brook were available to Bailey through several sources, but were not requested. As such, Fortier has satisfied the first *Hemphill* factor.

### 2. *Presentation of Defense/Estoppel*

**\*7** The focus of the second prong of the *Hemphill* analysis is upon "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (citations omitted). In her answer, Fortier raised exhaustion as a defense in a timely fashion. *See* Answer (Dkt. No. 22) Second Defense ("Plaintiff clearly failed to exhaust his administrative remedies, as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a).*"*). Bailey argues, however, that his failure to follow the prescribed grievance process was a direct result of the refusal of prison officials to cooperate in his efforts to grieve the matter.

" 'Generally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies based on the actions (or inactions) of other individuals.' " *Atkins v. Menard,* No. 9:11–CV–9366, 2012 WL 4026840, at \*3 (N.D.N.Y. Sept.12, 2012) (Suddaby, J.) (citing *Murray,* 2010 WL 1235591, at \*5 and n. 26 (collecting cases)). Put differently, a plaintiff must allege that a defendant named in the lawsuit acted to interfere with his ability to exhaust in order to establish a basis to estop that defendant from invoking the exhaustion defense. *Calloway,* 2011 WL 4345299, at \*4 (citing *Bennett v. James,* 737 F.Supp.2d

219, 226 (S.D.N.Y.2010), *aff'd,* 441 F. App'x 816 (2d Cir.2011)) (other citations omitted).

The question of whether, in this instance, prison officials should be estopped from asserting failure to exhaust as an affirmative defense as a result of their conduct is inextricably intertwined with the question of availability of the remedy. Assuming, however, that this presents a distinct inquiry, the court must examine whether, through her conduct, Fortier has provided a basis to estop her from asserting an exhaustion defense.

In this instance, Bailey does not allege that Fortier engaged in a campaign to preclude him from filing a grievance regarding her actions. Instead, his focus is upon the alleged refusal of other officials at FCI Ray Brook to provide him with necessary forms and cooperate in his efforts to present his grievance against Fortier. Accordingly, Bailey has failed to present any evidence that would support an estoppel against the defendant from raising the issue of exhaustion. *Atkins,* 2012 WL 4026840, at \* 3. Therefore, I conclude that Fortier has proven, by a preponderance of the evidence, that she did not, through her own actions, preclude Bailey from taking advantage of the ARP and therefore should not be estopped from asserting the defense.

### 3. *Special Circumstances*

The third, catchall factor that must be considered under the Second Circuit's prescribed exhaustion rubric centers upon whether special circumstances sufficient to justify excusing the plaintiff's failure to exhaust administrative remedies have been demonstrated. *Hemphill,* 380 F.3d at 689; *see also Giano,* 380 F.3d at 676–77; *Hargrove,* 2007 WL 389003, at \*10. Among the circumstances potentially qualifying as "special" under this prong of the test is where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable. *Giano,* 380 F.3d at 676–77; *see also Hargrove,* 2007 WL 389003, at \*10 (quoting and citing *Giano* ). Special circumstances may also exist when a facility's "[f]ailure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals-which effectively rendered the grievance process unavailable to him." *Murray,* 2010 WL 1235591, at \*6 (quoting *Sandlin v. Poole,* 488 (W.D.N.Y.2008) (noting that "[s]uch facts support a finding that defendant's are estopped from

relying on exhaustion defense as 'special circumstances' excusing plaintiff's failure to exhaust")).

**\*8** During the evidentiary hearing, Bailey testified to his awareness of the existence of the ARP at FCI Ray Brook. *See, e.g.,* Tr. 102. Bailey's testimony regarding his alleged efforts to secure the forms necessary to pursue the grievance plainly evidences his knowledge of the requirement that he exhaust available administrative remedies, and negates a finding of any reasonable belief on his part that the dispute in issue was not grievable and could not have been presented through the BOP's internal grievance process. Accordingly, again allocating the ultimate burden of proof on the issue of special circumstances to the defendant, I nonetheless conclude that she has demonstrated, by a preponderance of the evidence, the absence of any special circumstances that would serve to excuse plaintiff's failure to exhaust administrative remedies.

## IV. *SUMMARY AND RECOMMENDATION*

The credible testimony and evidence adduced at the recent hearing, held to address the merits of defendant's exhaustion defense, establishes that (1) Bailey failed to avail himself of the BOP grievance process, which was available to him, before commencing this action; (2) Fortier did not, through her actions, preclude Bailey from filing a grievance regarding the claims set forth in his complaint, or otherwise engage in conduct for which she should be estopped from asserting failure to exhaust as an affirmative defense; and (3) Bailey has offered no special circumstances warranting that he be excused from the PLRA's exhaustion requirement. Accordingly, it is therefore hereby respectfully

RECOMMENDED, that plaintiff's complaint in this action be DISMISSED, based upon his failure to comply with the exhaustion requirements of 42 U.S.C. § 1997e(a).

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 6935254

Footnotes

1    *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

2    The June 20, 2012 Hearing Transcript (Dkt. No. 44) will hereinafter be cited as "Tr. ____".

3    According to Bailey, there were no corrections officers present in his cell unit at the time of the assault. Complaint (Dkt. No. 1) ¶ 13.

4    Plaintiff was aware of the twenty-day limitation for filing a BP–9 form to initiate the formal grievance process. Tr. 103.

5    Here, the record demonstrates that in light of his circumstances, including the fourteen-day period of hospitalization following the incident, Bailey almost certainly would have been granted relief from that requirement had such a request been made. *See* Tr. 43, 144. I note, parenthetically, that the handbook provided to inmates at FCI Ray Brook does not address the possibility of requesting an extension of the twenty-day time limit for filing a BP–9. *See* Tr. 34, 43.

6    Jean Marie Diehl took over as plaintiff's correction counselor in or about September 2009, shortly before Snyder's retirement from the BOP. Tr. 140, 163.

7    During the hearing Bailey testified that he did not recall Darrah visiting him. *See* Tr. 114. Once again, I credit the testimony of Darrah over that of the Bailey with respect to this issue.

8    The hearing was conducted by video conference, with Bailey participating and testifying from the Kentucky federal correctional facility in which he is currently being held, pursuant to Rule 43(a) of the Federal Rules of Civil Procedure. *See Rivera v. Santirocco,* 814 F.2d 859, 862 (2d Cir.1987). At the outset of the hearing I placed upon the record the factors which I considered in declining to exercise my discretion to require that Bailey be produced in person for the evidentiary hearing. *See* Tr. 3.

9   Attorney Michael J. Sciotti, Esq., of the firm of Hancock & Estabrook, LLP, was appointed in January 2012 to represent the plaintiff in this action, *pro bono,* at the hearing. The court wishes to express its thanks to Attorney Sciotti and his co-counsel, Robert Thorpe, Esq., for their energetic and diligent efforts on behalf of the plaintiff.

10   In *Macias,* which, like this action, involved an Eighth Amendment claim under *Bivens,* as well as claims under the Federal Court Claims Act, 28 U.S.C. § 2671 *et seq.,* defendants asserted that plaintiff's complaint was subject to dismissal under the PLRA based upon his failure to exhaust available administrative remedies. *Macias,* 495 F.3d at 40. Reiterating the importance of exhaustion in both a substantive and a procedural sense, the Second Circuit concluded that, while a prisoner may have substantially exhausted remedies by making informal complaints regarding the conditions at issue, the PLRA, as illuminated by *Woodford,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368, requires proper procedural exhaustion through the available grievance channels. *Id.* at 41. The court left open, however, the possibility that, notwithstanding the Supreme Court's decision in *Woodford,* a defendant could be precluded from asserting failure to exhaust available administrative remedies in the event of a finding that threats by prison officials may have deterred compliance with the PLRA exhaustion requirements, including under *Hemphill. Id.* at 44–45. The court in *Macias* also noted that the plaintiff in that case did not assert that the available internal remedial scheme was so confusing as to excuse his failure to avail himself of that process, thereby obviating the need for the court to determine what effect, if any, *Woodford* would have upon the *Hemphill* holding to the effect that a reasonable misinterpretation of the available scheme could justify an inmate's failure to follow the procedural rules. *See Amador v. Superintendents of Dep't of Correctional Serv.,* No. 03 CIV. 0650 (KTD/CWG), 2007 WL 4326747, at *6 (S.D.N.Y. Dec.4, 2007). It therefore appears that the teachings of *Hemphill* remain intact, at least with regard to the first two points of inquiry. *Id.* at *7.

11   In practicality, these three prongs of the prescribed test, though perhaps intellectually distinct, plainly admit of significant overlap. *See Hargrove,* 2007 WL 389003, at *8 n. 14; *see also Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone,
New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

 **\*1**  The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary
judgment and dismissing the amended complaint, and
United States Magistrate Judge James C. Francis IV
having issued a report and recommendation, dated
August 20, 1999, recommending that the motion
be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff does
"not contest the dismissal of this action", it is

ORDERED that the attached report and
recommendation of United States Magistrate Judge
James C. Francis IV, dated August 20, 1999, is adopted in
its entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant
Richard Pflueger, a corrections officer, violated his First
Amendment rights by refusing to allow him to attend
religious services. The defendant now moves for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth below, I recommend
that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at the
Green Haven Correctional Facility. (First Amended
Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to
July 15, 1993, the plaintiff was in keeplock because of
an altercation with prison guards. (Am.Compl.¶¶ 17–
25). An inmate in keeplock is confined to his cell for
twenty-three hours a day with one hour for recreation.
(Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶
5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶
3). Permission is granted unless prison officials determine
that the inmate's presence at the service would create
a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests
by inmates in keeplock to attend religious services.
(Schneider Aff. ¶ 3). Written approval is provided to the
inmate if authorization is granted. (Affidavit of Richard
Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The
inmate must then present the appropriate form to the

gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at \*3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW,* No. 91 Civ. 5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*' s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

### B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

### *Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with

the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

Footnotes

1    In light of this finding, there is no need to consider the defendant's qualified immunity argument.

**WESTLAW**  © 2016 Thomson Reuters. No claim to original U.S. Government Works.                    4

KeyCite Yellow Flag - Negative Treatment
Distinguished by Arnett v. Shojaie, C.D.Cal., November 8, 2011

2010 WL 1235591
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

James MURRAY, Plaintiff,
v.
R. PALMER; S. Griffin; M. Terry;
F. Englese; Sergeant Edwards; K.
Bump; and K.H. Smith, Defendants.

No. 9:03-CV-1010 (GTS/GHL).
|
March 31, 2010.

**Attorneys and Law Firms**

James Murray, Malone, NY, pro se.

Bosman Law Office, AJ Bosman, Esq., of Counsel, Rome, NY, for Plaintiff.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Timothy Mulvey, Esq., James Seaman, Esq., Assistant Attorneys General, of Counsel, Albany, NY, for Defendants.

*DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** The trial in this prisoner civil rights action, filed *pro se* by James Murray ("Plaintiff") pursuant to 42 U.S.C. § 1983, began with an evidentiary hearing before the undersigned on March 1, 2010, regarding the affirmative defense of seven employees of the New York State Department of Correctional Services-R. Palmer, S. Griffin, M. Terry, F. Englese, Sergeant Edwards, K. Bump, and K.H. Smith ("Defendants")-that Plaintiff failed to exhaust his available administrative remedies, as required by the Prison Litigation Reform Act, before filing this action on August 14, 2003. At the hearing, documentary evidence was admitted, and testimony

was taken of Plaintiff as well as Defendants' witnesses (Darin Williams, Sally Reams, and Jeffery Hale), whom Plaintiff was able to cross-examine through *pro bono* trial counsel. At the conclusion of the hearing, the undersigned indicated that a written decision would follow. This is that written decision. For the reasons stated below, Plaintiff's Second Amended Complaint is dismissed because of his failure to exhaust his available administrative remedies.

**I. RELEVANT LEGAL STANDARD**

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997e. The PLRA was enacted "to reduce the quantity and improve the quality of prisoner suits" by "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle,* 534 U.S. 516, 524-25, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In this regard, exhaustion serves two major purposes. First, it protects "administrative agency authority" by giving the agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures." *Woodford v. Ngo,* 548 U.S. 81, 89, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). Second, exhaustion promotes efficiency because (a) "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court," and (b) "even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial review." *Woodford,* 548 U .S. at 89. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532.

In accordance with the PLRA, the New York State Department of Correctional Services ("DOCS") has made available a well-established inmate grievance program. 7 N.Y.C.R.R. § 701.7. Generally, the DOCS Inmate Grievance Program ("IGP") involves the following three-step procedure for the filing of grievances. 7 N.Y.C.R.R.

§§ 701.5, 701.6(g), 701.7.[1] *First,* an inmate must file a complaint with the facility's IGP clerk within a certain number of days of the alleged occurrence.[2] If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has a certain number of days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within a certain number of days of receipt of the grievance, and issues a written decision within a certain number of days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within a certain number of days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within a certain number of days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within a certain number of days of receipt of the superintendent's written decision. CORC is to render a written decision within a certain number of days of receipt of the appeal.

**\*2** Moreover, there is an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 N.Y.C.R.R. § 701.8. In the event the inmate seeks expedited review, he or she may report the misconduct to the employee's supervisor. The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the superintendent for review. Under the regulations, the superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment, and if so, shall initiate an investigation of the complaint, either "in-house," by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. An appeal of the adverse decision of the superintendent may be taken to the CORC as in the regular grievance procedure. A similar "special" procedure is provided for claims of discrimination against an inmate. 7 N.Y.C.R.R. § 701.9.

It is important to note that these procedural requirements contain several safeguards. For example, if an inmate could not file such a complaint within the required time period after the alleged occurrence, he or she could apply to the facility's IGP Supervisor for an exception to the

time limit based on mitigating circumstances. If that application was denied, the inmate could file a complaint complaining that the application was wrongfully denied.[3] Moreover, any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can-and must-be appealed to the next level, including CORC, to complete the grievance process.[4] There appears to be a conflict in case law regarding whether the IGRC's nonresponse must be appealed to the superintendent where the plaintiff's grievance was never assigned a grievance number.[5] After carefully reviewing this case law, the Court finds that the weight of authority appears to answer this question in the affirmative.[6] The Court notes that, if the plaintiff adequately describes, in his appeal to the superintendent, the substance of his grievance (or if the plaintiff attaches, to his appeal, a copy of his grievance), it would appear that there is something for the superintendent to review.

It is also important to note that DOCS has a *separate and distinct* administrative appeal process for inmate misbehavior hearings:

    A. For Tier III superintendent hearings, the appeal is to the Commissioner's designee, Donald Selsky, D.O.C.S. Director of Special Housing/Inmate Disciplinary Program, pursuant to 8 N.Y.C.R.R. § 254.8;

    B. For Tier II disciplinary hearings, the appeal is to the facility superintendent pursuant to 7 N.Y.C.R.R. § 253.8; and

    C. For Tier I violation hearings, the appeal is to the facility superintendent or a designee pursuant to 7 N.Y.C.R.R. § 252.6.

**\*3** "An individual decision or disposition of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered nongrievable." 7 N.Y.C.R.R. § 701.3(e)(1). Similarly, "an individual decision or disposition resulting from a disciplinary proceeding ... is not grievable." 7 N.Y.C.R.R. § 701.3(e)(2). However, "[t]he policies, rules, and procedures of any program or procedure, including those above, are grievable." 7 N.Y.C.R.R. § 701.3(e)(3); *see also* N.Y. Dep't Corr. Serv. Directive No. 4040 at III.E.

Generally, if a prisoner has failed to follow each of the required three steps of the above-described grievance procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Porter,* 534 U.S. at 524). However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004), *accord, Ruggiero,* 467 F.3d at 175. First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* [citations omitted]. Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* [citations and internal quotations omitted].

With regard to this third inquiry, the Court notes that, *under certain circumstances,* an inmate may exhaust his administrative remedies by raising his claim during a related *disciplinary proceeding. Giano v. Goord,* 380 F.3d 670, 678-79 (2d Cir.2004); *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004).[7] However, in essence, the circumstances in question include instances in which (1) the inmate reasonably believed that his "only available remedy" was to raise his claim as part of a tier disciplinary hearing,[8] *and* (2) the inmate articulated and pursued his claim in the disciplinary proceeding in a manner that afforded prison officials the time and opportunity to thoroughly investigate that claim.[9] Some district courts have found the first requirement not present where (a) there was nothing objectively confusing about the DOCS regulations governing the grievability of his claim,[10] (b) the inmate was specifically informed that the claim in question was grievable,[11] (c) the inmate separately

pursued the proper grievance process by filing a grievance with the IGRC,[12] (d) by initially alleging that he did appeal his claim to CORC (albeit without proof), the inmate has indicated that, during the time in question, he understood the correct procedure for exhaustion,[13] and/or (e) before and after the incident in question, the inmate pursued similar claims through filing a grievance with the IGRC.[14] Other district courts have found the second requirement not present where (a) the inmate's mention of his claim during the disciplinary hearing was so insubstantial that prison officials did not subsequently investigate that claim,[15] and/or (b) the inmate did not appeal his disciplinary hearing conviction.[16]

**\*4** Finally, two points bear mentioning regarding exhaustion. First, given that non-exhaustion is an affirmative defense, the defendant bears the burden of showing that a prisoner has failed to exhaust his available administrative remedies. *See, e.g., Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, *4 (S.D.N.Y. July 25, 2008).* However, once a defendant has adduced reliable evidence that administrative remedies were available to Plaintiff and that Plaintiff nevertheless failed to exhaust those administrative remedies, Plaintiff must then "counter" Defendants' assertion by showing exhaustion, unavailability, estoppel, or "special circumstances."[17]

Second, the Court recognizes that there is case law from within the Second Circuit supporting the view that the exhaustion issue is one of fact, which should be determined by a jury, rather than by the Court.[18] However, there is also case law from within the Second Circuit supporting the view that the exhaustion issue is one of law, which should be determined by the Court, rather than by a jury.[19] After carefully reviewing the case law, the Court finds that the latter case law-which includes cases from the Second Circuit and this District-outweighs the former case law.[20] (The Court notes that the latter case law includes cases from the Second Circuit and this District.)[21] More importantly, the Court finds that the latter cases are better reasoned than are the former cases. In particular, the Court relies on the reasons articulated by the Second Circuit in 1999: "Where administrative remedies are created by statute or regulation affecting the governance of prisons, ... the answer depends on the meaning of the relevant statute or regulation." *Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999). The Court relies also

on the several reasons articulated by Judge Richard A. Posner in a recent Seventh Circuit decision: most notably, the fact that the exhaustion-of-administrative-remedies inquiry does not address the merits of, or deadlines governing, the plaintiff's claim but an issue of "judicial traffic control" (i.e., what forum a dispute is to be resolved in), which is never an issue for a jury but always an issue for a judge. *See Pavey v. Conley,* 544 F.3d 739, 740-42 (7th Cir.2008) (en banc), *cert. denied,* --- U.S. ----, 129 S.Ct. 1620, 173 L.Ed.2d 995 (2009). The Court notes that the First, Third, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth and Eleventh Circuits appear to agree with the ultimate conclusion of the Second and Seventh Circuits that the exhaustion issue is properly decided by a judge, not a jury.[22]

## II. ANALYSIS

As an initial matter, Plaintiff argues that he exhausted his administrative remedies regarding the claims at issue in this action, by filing a grievance regarding those claims, and then appealing the non-response to that grievance all the way to CORC. Because the Court rejects this argument based on the evidence adduced at the hearing, the Court proceeds to an analysis of the three-step exhaustion inquiry established by the Second Circuit.

### A. Availability of Administrative Remedies

**\*5** New York prison inmates are subject to an Inmate Grievance Program established by DOCS and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at \*4 (S.D.N.Y. Feb.20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003), and *Snider v. Melindez,* 199 F.3d 108, 112-13 [2d Cir.1999] ). There are different circumstances under which the grievance procedure is deemed not to have been available to an inmate plaintiff. *Hemphill,* 380 F.3d at 687-88. For example, courts have found unavailability "where plaintiff is unaware of the grievance procedures or did not understand it or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Hargrove v. Riley,* 04-CV-4587, 2007 WL 389003, at \*8 (E.D.N.Y. Jan.31, 2007) (internal citations omitted). When testing the availability of administrative remedies in the face of claims that undue influence from prison workers has caused a plaintiff inmate to forego the formal grievance process, courts employ an objective test, examining whether "a similarly situated individual of ordinary firmness [would]

have deemed them available." *Hemphill,* 380F.3d at 688 (quotations and citations omitted); *see Hargrove,* 2007 WL 389003, at \*8.

Here, after carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that administrative remedies were "available" to Plaintiff during the time in question. The Court makes this finding for the following four reasons.

First, in his sworn Complaint (which has the force and effect of an affidavit), Plaintiff stated, "Yes," in response to the question, "Is there a prisoner grievance procedure at this facility ." (Dkt. No. 1, ¶ 4.a.)[23] Second, both Darin Williams (the corrections officer in charge of the special housing unit during the relevant time period) and Sally Reams (the Inmate grievance program supervisor during the relevant time period) testified credibly, at the exhaustion hearing, that there was a working grievance program at Great Meadow Correctional Facility during the time in question. (Hearing Tr. at 10, 12, 14-21, 40-54.) Third, Plaintiff testified, at the exhaustion hearing that, during this approximate time period (the August to November of 2000), he filed at least three other grievances Great Meadow Correctional Facility, to which he received responses from the inmate grievance clerk, the Superintendent, and CORC. (*Id.* at 154, 157-58, 169-70; *see also* Hearing Exs. D-4, D-5, P-8, P-13, P-14.)[24] Fourth, the Court finds the relevant portions of Plaintiff's hearing testimony regarding the grievance at issue in this action to be incredible due to various omissions and inconsistencies in that testimony, and his demeanor during the hearing. (*Id.* at 127-34.)[25]

### B. Estoppel

After carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that Defendants did not forfeit the affirmative defense of non-exhaustion by failing to raise or preserve it, or by taking actions that inhibited Plaintiff's exhaustion of remedies. For example, Defendants' Answer timely asserted this affirmative defense. (Dkt. No. 35, ¶ 17.) Moreover, Plaintiff failed to offer any credible evidence at the hearing that *Defendant* s in any way interfered with Plaintiff's ability to file grievances during the time in question. (Hearing Tr. at 127-34, 157-58, 169-70.) Generally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to

exhaust administrative remedies based on the actions (or inactions) of other individuals. [26]

### C. Special Circumstances

**\*6** There are a variety of special circumstances that may excuse a prisoner's failure to exhaust his available administrative remedies, including (but not limited to) the following:

(1) The facility's "failure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals-which effectively rendered the grievance appeal process unavailable to him." *Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "[s]uch facts support a finding that defendants are estopped from relying on the exhaustion defense, as well as "special circumstances" excusing plaintiff's failure to exhaust");

(2) Other individuals' "threats [to the plaintiff] of physical retaliation and reasonable misinterpretation of the statutory requirements of the appeals process." *Clarke v. Thornton,* 515 F.Supp.2d 435, 439 (S.D.N.Y.2007) (noting also that "[a] correctional facility's failure to make forms or administrative opinions "available" to the prisoner does not relieve the inmate from this burden."); and

(3) When plaintiff tries "to exhaust prison grievance procedures[, and] although each of his efforts, alone, may not have fully complied, together his efforts sufficiently informed prison officials of his grievance and led to a thorough investigation of the grievance." *Hairston v. LaMarche,* 05-CV-6642, 2006 WL 2309592, at \*8 (S.D.N.Y. Aug.10, 2006).

After carefully considering the issue, the Court finds that there exists, in this action, no "special circumstances" justifying Plaintiff's failure to comply with the administrative procedural requirements. Construed with the utmost of special leniency, Plaintiff's hearing testimony, and his counsel's cross-examination of Defendants' witnesses, raise the specter of two excuses for not having exhausted his available administrative remedies before he (allegedly) mailed his Complaint in

this action on August 14, 2003:(1) that exhaustion was not possible because of the administrative procedures that DOCS has implemented regarding inmate grievances; and/or (2) that an unspecified number of unidentified corrections officers (who are not Defendants in this action) somehow interfered with the delivery of his grievance and appeals. For example, Plaintiff testified at the exhaustion hearing that he handed his grievance and appeals to various corrections officers making rounds where he was being housed, and that, if his grievance and/or appeals were never received, it must have been because his letters were not properly delivered. (Hearing Tr. at 126-36.)

With regard to these excuses, the Court finds that, while these excuses could constitute special circumstances justifying an inmate's failure to exhaust his available administrative remedies in certain situations, [27] these excuses are not available to Plaintiff in the current action because, as stated in Part II.A. of this Decision and Order, the credible testimony before the Court indicates that Plaintiff did not hand his grievance and appeals to various corrections officers with regard to the claims in question. *See, supra,* Part II.A. of this Decision and Order. [28]

**\*7** For all these reasons, the Court finds that Plaintiff's proffered excuse does not constitute a special circumstance justifying his failure to exhaust his available administrative remedies before filing this action.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's Second Amended Complaint (Dkt. No. 10) is *DISMISSED* **in its entirety without prejudice** for failure to exhaust his available administrative remedies before filing this action, pursuant to the PLRA; and it is further

**ORDERED** that the Clerk of the Court shall enter judgment for Defendants and close the file in this action.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 1235591

Footnotes

1    *See also White v. The State of New York,* 00-CV-3434, 2002 U . S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002).

2    The Court uses the term "a certain number of days" rather than a particular time period because (1) since the three-step process was instituted, the time periods imposed by the process have changed, and (2) the time periods governing any particular grievance depend on the regulations and directives pending during the time in question.

3    *Groves v. Knight,* 05-CV-0183, Decision and Order at 3 (N.D.N.Y. filed Aug. 4, 2009) (Suddaby, J.).

4    7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g* ., DOCS Directive 4040 dated 8/22/03, ¶ VI.G. ("Absent [a time limit extension granted by the grievant], matters not decided within the time limits may be appealed to the next step."); *Pacheco v. Drown,* 06-CV-0020, 2010 WL 144400, at *19 & n. 21 (N.D.N.Y. Jan.11, 2010) (Suddaby, J.) ("It is important to note that any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process."), *accord, Torres v. Caron,* 08-CV-0416, 2009 WL 5216956, at *5 & n. 28 (N.D.N.Y. Dec.30, 2009) (Mordue, C.J.), *Benitez v. Hamm,* 04-CV-1159, 2009 WL 3486379, at *13 & n. 34 (N.D.N.Y. Oct.21, 2009) (Mordue, C.J.), *Ross v. Wood,* 05-CV-1112, 2009 WL 3199539, at *11 & n. 34 (N.D.N.Y. Sept.30, 2009) (Scullin, J.), *Sheils v. Brannen,* 05-CV-0135, 2008 WL 4371776, at *6 & n. 24 (N.D.N.Y. Sept.18, 2008) (Kahn, J.), *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *15 & n. 46 (N.D.N.Y. June 20, 2008) (Hurd, J.), *McCloud v. Tureglio,* 07-CV-0650, 2008 WL 17772305, at *10 & n. 25 (N.D.N.Y. Apr. 15, 2008) (Mordue, C.J.), *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *14 & n. 114 (N.D.N.Y. Nov.5, 2007) (McAvoy, J.); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.); *Gill v. Frawley,* 02-CV-1380, 2006 WL 1742738, at *11 & n. 66 (N.D.N.Y. June 22, 2006) (McAvoy, J.) ("[A]n inmate's mere attempt to file a grievance (which is subsequently lost or destroyed by a prison official) is not, in and of itself, a reasonable effort to exhaust his administrative remedies since the inmate may still appeal the loss or destruction of that grievance."); *Walters v. Carpenter,* 02-CV-0664, 2004 WL 1403301, at *3 (S.D.N.Y. June 22, 2004) ("[M]atters not decided within the prescribed time limits must be appealed to the next level of review."); *Croswell v. McCoy,* 01-CV-0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him.").

5    *Compare Johnson v. Tedford,* 04-CV-0632, 616 F.Supp.2d 321, 326 (N.D.N.Y.2007) (Sharpe, J.) ("[W]hen a prisoner asserts a grievance to which there is no response, *and it is not recorded or assigned a grievance number,* administrative remedies may be completely exhausted, as there is nothing on record for the next administrative level to review.") [emphasis in original, and citations omitted] *with Waters v. Schneider,* 01-CV-5217, 2002 WL 727025, at *2 (S.D.N.Y. Apr.23, 2002) (finding that, in order to exhaust his available administrative remedies, plaintiff had to file an appeal with the superintendent from the IGRC's non-response to his grievance, of which no record existed).

6    *See, e.g., Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *16, 18 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) (finding that, in order to exhaust his available administrative remedies with regard to his grievance of August 30, 2000, plaintiff had to file an appeal with the superintendent from the IGRC's non-response to that grievance, which included a failure to acknowledge the receipt of the grievance and assign it a number); *Midalgo v. Bass,* 03-CV-1128, 2006 WL 2795332, at *7 (N.D.N.Y. Sept.26, 2006) (Mordue, C.J., adopting Report-Recommendation of Treece, M.J.) (observing that plaintiff was "requir[ed]" to seek an appeal to the superintendent, even though he never received a response to his grievance of April 26, 2003, which was never assigned a grievance number); *Collins v. Cunningham,* 06-CV-0420, 2009 WL 2163214, at *3, 6 (W.D.N.Y. July 20, 2009) (rejecting plaintiff's argument that his administrative remedies were not available to him where his grievance of March 20, 2004, was not assigned a grievance number); *Veloz v. New York,* 339 F.Supp.2d 505, 515-16 (S.D.N.Y.2004) (rejecting inmate's argument that the prison's grievance procedure had been rendered unavailable to him by the practice of prison officials' losing or destroying his grievances, because, *inter alia,* "there was no evidence whatsoever that any of [plaintiff's] grievances were filed with a grievance clerk," and he should have "appeal[ed] these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming"); *cf. Hernandez v. Coffey,* 582 F.3d 303, 305, 309, n. 3 (2d Cir.2009) ("Our ruling in no way suggests that we agree with Hernandez's arguments regarding exhaustion or justification for failure to exhaust [which included an argument that the Inmate Grievance Program was not available to him because, when

he filed a grievance at the first stage of the Program, he received no response and his grievance was not assigned a grievance number].").

7    The Court recognizes that the Supreme Court's decision in *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), may have changed the law regarding possible exceptions to the exhaustion requirement (and thus the possibility that exhaustion might occur through the disciplinary process). Specifically, in *Woodford,* the Supreme Court held that the PLRA required "proper" exhaustion as a prerequisite to filing a section 1983 action in federal court. *Woodford,* 548 U.S. at 93. "Proper" exhaustion means that the inmate must complete the administrative review process *in accordance with the applicable procedural rules,* as a prerequisite to bringing suit in federal court. *Id.* at 88-103 (emphasis added). It is unclear whether *Woodford* has overruled any decisions that recognize "exceptions" to the exhaustion requirement. Out of special solicitude to Plaintiff, the Court will assume that *Woodford* has not overruled the Second Circuit's *Giano-Testman* line of cases.

8    *Giano,* 380 F.3d at 678 ("[W]hile Giano was required to exhaust available administrative remedies before filing suit, his failure to do so was justified by his reasonable belief that DOCS regulations foreclosed such recourse."); *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia,* whether prisoner was justified in believing that his complaints in the disciplinary appeal procedurally exhausted his administrative remedies because the prison's remedial system was confusing).

9    *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia.* whether prisoner's submissions in the disciplinary appeals process exhausted his remedies "in a substantive sense" by "afford[ing] corrections officials time and opportunity to address complaints internally"); *Chavis v. Goord,* 00-CV-1418, 2007 WL 2903950, at *9 (N.D.N.Y. Oct.1, 2007) (Kahn, J.) ("[T]o be considered proper, exhaustion must occur in both a substantive sense, meaning that prison officials are somehow placed on notice of an inmate's complaint, and procedurally, in that it must be presented within the framework of some established procedure that would permit both investigation and, if appropriate, remediation.") [citation omitted]. The Court joins the above-described two requirements in the conjunctive because the Second Circuit has recognized that mere notice to prison officials through informal channels, without more, does not suffice to satisfy the PLRA procedural exhaustion requirement. *See Macias v. Zenk,* No. 04-6131, 495 F.3d 37, at *43-44 (2d Cir.2007) (recognizing that *Woodford v. Ngo,* 548 U.S. 81 [2006], overruled *Braham v. Casey,* 425 F.3d 177 [2d Cir.2005], to the extent that *Braham* held that "informal complaints" would suffice to exhaust a claim).

10   *See, e.g., Reynoso v. Swezey,* 423 F.Supp.2d 73, 75 (W.D.N.Y.2006), *aff'd,* 238 F. App'x 660 (2d Cir.2007) (unpublished order), *cert. denied,* 552 U.S. 1207, 128 S.Ct. 1278, 170 L.Ed.2d 109 (2008); *Holland v. James,* 05-CV-5346, 2009 WL 691946, at *3 (S.D.N.Y. March 6, 2009); *Winston v. Woodward,* 05-CV-3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008); *cf. Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *5 & n. 23 (N.D.N.Y. July 11, 2007) (McAvoy, J.) (reciting this point of law in context of failure to appeal grievance determination to CORC).

11   *See, e.g., Johnson v. Barney,* 04-CV-10204, 2007 WL 2597666, at *2 (S.D.N.Y. Aug.30, 2007); *Reynoso,* 423 F.Supp.2d at 75-76.

12   *See, e.g., Reynoso,* 423 F.Supp.2d at 75 ("There is no evidence that plaintiff was confused or misled about the proper method for raising his claims. In fact, the record shows exactly the opposite: plaintiff did file a grievance about the incident. He simply failed to appeal the denial of that grievance to CORC."); *Tapp v. Kitchen,* 02-CV-6658, 2004 WL 2403827, at *9 (W.D.N.Y. Oct.26, 2004) ("In the instant case, however, plaintiff does not and cannot claim to have believed that his only available remedy was to raise his complaint as part of his disciplinary hearing, since he also filed a grievance with the Inspector General, and also claims to have filed both an inmate grievance and a separate complaint with the facility superintendent."); *cf. Muniz,* 2007 WL 2027912, at *5 & n. 23 ("Plaintiff's Complaint alleges facts indicating that he believed it necessary to file a grievance with the Gouverneur C.F. IGRC and to appeal the denial of that grievance to the Gouverneur C.F. Superintendent. Why would he not also believe it necessary to take the next step in the exhaustion process and appeal the Superintendent's decision to CORC?").

13   *See, e.g., Petrusch v. Oliloushi,* 03-CV-6369, 2005 WL 2420352, at *5 (W.D.N.Y. Sept.30, 2005) ("[A]s to his grievance, which is the subject of this lawsuit, plaintiff does not appear to be contending that he believed the Superintendent's denial constituted exhaustion, since by initially claiming that he did appeal to CORC, albeit without proof, he has demonstrated his knowledge of the correct procedure for exhaustion.").

14   *See, e.g., Benjamin v. Comm'r N.Y. State DOCS,* 02-CV-1703, 2007 WL 2319126, at *14 (S.D.N.Y. Aug.10, 2007) ("Benjamin cannot claim that he believed that appealing his disciplinary proceeding was the only available remedy at his disposal in light of the numerous grievances he has filed during his incarceration at Green Haven [both before and after the incident in question]."), *vacated in part on other grounds,* No. 07-3845, 293 F. App'x 69 (2d Cir.2008).

**15**     *See, e.g., Chavis,* 2007 WL 2903950, at *9 ("The focus of a disciplinary hearing is upon the conduct of the inmate, and not that of prison officials.... While the mention of a constitutional claim during plaintiff's disciplinary hearing could potentially have satisfied his substantive exhaustion requirement by virtue of his having notified prison officials of the nature of his claims, he did not fulfill his procedural exhaustion requirement [under the circumstances due to his] ... mere utterance of his claims during the course of a disciplinary hearing .... [T]here is nothing in the record to suggest that when the issues of interference with plaintiff's religious free exercise rights or alleged retaliation for having voiced his concerns were in any way investigated by prison officials.") [citations omitted].

**16**     *See, e.g., Colon v. Furlani,* 07-CV-6022, 2008 WL 5000521, at *2 (W.D.N.Y. Nov.19, 2008) ("Colon was found guilty of harassment based on a letter that he wrote to defendant Bordinaro, concerning some of the events giving rise to his failure-to-protect claim, but it does not appear that he appealed that disposition.... While under some circumstances an inmate may be able to satisfy the exhaustion requirement by appealing from a disciplinary hearing decision ..., plaintiff did not do so here, and this claim is therefore barred under the PLRA.") [citations omitted]; *Cassano v. Powers,* 02-CV-6639, 2005 WL 1926013, at *5 (W.D.N.Y. Aug.10, 2005) ("[E]ven assuming plaintiff believed that his proper recourse was to raise [his] complaint at his disciplinary hearing, rather than using the Inmate Grievance Program, he did not exhaust that process. That is, plaintiff has not provided any evidence that he appealed his Tier III hearing conviction. Since plaintiff did not pursue even the disciplinary appeal process, he can not have made submissions in the disciplinary process that were sufficient, in a substantive sense, to exhaust his remedies under § 1997e(a).") [internal quotation marks and citation omitted].

**17**     *See Hemphill,* 380 F.3d at 686 (describing the three-part inquiry appropriate in cases where a prisoner plaintiff plausibly seeks to "counter" defendants' contention that the prisoner failed to exhaust his available administrative remedies under the PLRA); *Verley v. Wright,* 02-CV-1182, 2007 WL 2822199, at *8 (S.D.N.Y. Sept.27, 2007) ("[P]laintiff has failed to demonstrate that the administrative remedies were not, in fact, 'actually available to him.' "); *Winston v. Woodward,* 05-CV-3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) (finding that the plaintiff "failed to meet his burden under *Hemphill* of demonstrating 'special circumstances' "); *see also Ramirez v. Martinez,* 04-CV-1034, 2009 WL 2496647, at *4 (M.D.Pa. Aug.14, 2009) ("In order to effectively oppose defendants' exhaustion argument, the plaintiff has to make a showing in regard to each of his claims."); *Washington v. Proffit,* 04-CV-0671, 2005 WL 1176587, at *1 (W.D.Va. May 17, 2005) ("[I]t is plaintiff's duty, at an evidentiary hearing, "to establish by a preponderance of the evidence that he had exhausted his administrative remedies or that any defendant had hindered or prevented him from doing so within the period fixed by the Jail's procedures for filing a grievance.").

**18**     *See, e.g., Lunney v. Brureton,* 04-CV-2438, 2007 WL 1544629, at *10 n. 4 (S.D.N.Y. May 29, 2007) ("There is certainly case law that supports the view that exhaustion should be determined by the Court rather than by a jury. As the Supreme Court has recently affirmed, however, exhaustion is an 'affirmative defense.' much like a statute of limitations defense. Where there are disputed factual questions regarding an affirmative defense such as a statute of limitations defense, the Second Circuit has stated that 'issues of fact as to the application of that defense must be submitted to a jury.' Thus, it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court."); *Finch v. Servello,* 06-CV-1448, 2008 WL 4527758, at *8 n. 5 (N.D.N.Y. Sept.29, 2008) (McAvoy, J.) (citing *Lunney* and noting that "it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court").

**19**     *See, e.g., Harrison v. Goord,* 07-CV-1806, 2009 WL 1605770, at *7 n. 7 (S.D.N.Y. June 9, 2009) (recognizing that "[t]here is authority ... for the position that where questions of fact exist as to whether a plaintiff has exhausted administrative remedies, such fact questions are for the Court, rather than a jury, to decide ...."); *Amador v. Superintend. of Dept. of Corr. Servs.,* 03-CV-0650, 2007 WL 4326747, at *5 n. 7 (S.D.N.Y. Dec.4, 2007) ("It is unclear whether factual disputes regarding the exhaustion defense should ultimately be decided by the court or by a jury.... [T]here is ... case law ... supporting the view that exhaustion should be determined by the court and not a jury."), *appeal pending,* No. 08-2079-pr (2d Cir. argued July 15, 2009).

**20**     *See, e.g., Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438 (E.D.N.Y.2009) (noting that the magistrate judge held an evidentiary hearing "on the issue of exhaustion"); *Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, *3 n. 2 (S.D.N.Y. July 25, 2008) (finding that "the better approach is for the judge, and not the jury, to decide any contested issues of fact relating to the defense of failure to exhaust administrative remedies."); *Amador,* 2007 WL 4326747, at *5 n. 7 ("[T]here is ... case law, which in my view is more persuasive and on point, supporting the view that exhaustion should be determined by the court and not a jury. I find it proper that this issue be decided by the court."); *Enigwe v. Zenk,* 03-CV-0854, 2006 WL 2654985, at *4 (E.D.N.Y. Sept.15, 2006) (finding that, at the summary judgment "stage of the proceedings, a genuine question of fact exists with respect to whether [plaintiff] should be excused from exhausting his administrative remedies with regard to claims relating to his confinement at MDC Brooklyn," and therefore "direct[ing] that a hearing

be held" before a judge, to resolve this issue); *Dukes v. S.H.U. C.O. John Doe # 1,* 03-CV-4639, 2006 WL 1628487, at *6 (S.D.N.Y. June 12, 2006)* (ordering an "evidentiary hearing [before a judge] on the issue of whether prison officials failed to assign grievance numbers to [plaintiff]'s grievances and, if so, whether that rendered further administrative remedies unavailable, estopped the Defendants from asserting non-exhaustion, or justified [plaintiff]'s failure to appeal to the CORC"); *Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004)* ("The Court could have *sua sponte* dismiss[ed] this action as the record is unmistakeably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA.... In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear."); *Roland v. Murphy,* 289 F.Supp.2d 321, 323 (E.D.N.Y.2003)* "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law." [internal quotation marks and citation omitted]; *Evans v. Jonathan,* 253 F.Supp.2d 505, 509 (W.D.N.Y.2003)* ( "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law.").

21    *See, e.g., Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999)* ("Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They either are, or inevitably contain, questions of law. Where administrative remedies are created by statute or regulation affecting the governance of prisons, the existence of the administrative remedy is purely a question of law. The answer depends on the meaning of the relevant statute or regulation."), *accord, Mojias v. Johnson,* 351 F.3d 606, 608-11 (2d Cir.2003)* (citing relevant language from *Snider v. Melindez,* and later stating that a district court could *sua sponte* dismiss a prisoner's civil rights complaint for failure to exhaust his available administrative remedies if it gave him notice and an opportunity to be heard); *DeBlasio v. Moriarty,* 05-CV-1143, Minute Entry (N.D.N.Y. filed Dec. 9, 2008) (McCurn, J.) (indicating that judge held pre-trial evidentiary hearing on whether plaintiff had exhausted administrative remedies before filing action); *Pierre v. County of Broome,* 05-CV-0332, 2007 WL 625978, at *1 n. 1 (N.D.N.Y. Feb.23, 2007)* (McAvoy, J.) (noting that "[t]he court held an evidentiary hearing on October 25, 2006 concerning the issue of whether Plaintiff had exhausted administrative remedies"); *Hill v. Chanalor,* 419 F.Supp.2d 255, 257-59 (N.D.N.Y. March 8, 2006)* (Kahn, J.) (*sua sponte* dismissing a prisoner's civil rights complaint, pretrial, for failure to exhaust his available administrative remedies after it gave him notice and an opportunity to be heard); *Raines v. Pickman,* 103 F.Supp.2d 552, 555 (N.D.N.Y.2000)* (Mordue, J.) ("[I]n order for the Court to dismiss for failing to exhaust administrative remedies, the Court must be shown that such a remedy exists for an inmate beating in the grievance context. This is an issue of law for the Court to determine.").

22    *See Casanova v. Dubois,* 289 F.3d 142, 147 (1st Cir.2002); *Hill v. Smith,* 186 F. App'x 271, 273-74 (3d Cir.2006); *Mitchell v. Horn,* 318 F.3d 523, 529 (3d Cir.2003); *Anderson v. XYZ Corr. Health Servs., Inc.,* 407 F.3d 674, 682-83 (4th Cir.2005); *Dillon v. Rogers,* No. 08-30419, 2010 WL 378306, at *7 (5th Cir. Feb.4, 2010); *Taylor v. U.S.,* 161 F. App'x 483, 486 (6th Cir.2005); *Larkins v. Wilkinson,* 172 F.3d 48, at *1 (6th Cir.1998); *Husley v. Belken,* 57 F. App'x 281, 281 (8th Cir.2003); *Ponder v. Wackenhut Corr. Corp.,* 23 F. App'x 631, 631-32 (8th Cir.2002); *Wyatt v. Terhune,* 315 F.3d 1108, 1119-20 (9th Cir.2003), *cert. denied,* 540 U.S. 810 (2003); *Freeman v. Watkins,* 479 F.3d 1257, 1260 (10th Cir.2007); *Alloway v. Ward,* 188 F. App'x 663, 666 (6th Cir.2006); *Bryant v. Rich,* 530 F.3d 1368, 1373-76 (11th Cir.), *cert. denied,* --- U.S. ----, 129 S.Ct. 733, 172 L.Ed.2d 734 (2008).

23    The Court notes that, in his Complaint, Plaintiff also swore that his "grievance was denied." (Dkt. No. 1, ¶ 4.b.ii.) However, during the exhaustion hearing, Plaintiff testified that he never received a response to his grievance from any member of DOCS.

24    In addition, the documentary evidence adduced at the hearing establishes that, in actuality, Plaintiff filed ten other grievances during this time period (and several appeals from the denials of those grievances). The first of these grievances (Grievance Number GM-30651-00), filed on August 25, 2000, regarded Plaintiff's request for medications. (Hearing Exs. D-4, D-5.) The second of these grievances (Grievance Number GM-30691-00), filed on September 1, 2000, regarded Plaintiff's request for copies. (Hearing Ex. D-4.) The third of these grievances (Grievance Number GM-30729-00), filed on September 11, 2000, regarded the use of full restrains against Plaintiff. (*Id.; see also* Hearing Ex. P-14.) The fourth of these grievances, filed on October 19, 2000 (Grievance Number GM-30901-00), regarded Plaintiff's request for the repair of his cell sink. (Hearing Exs. D-4, D-5.) The fifth of these grievances (Grievance Number GM-30901-00), also filed on October 19, 2000, regarded Plaintiff's request for the clean up of his cell. (Hearing Ex. D-4.) The sixth of these grievances (Grievance Number GM-31040-00), filed on November 17, 2000, regarded the review of records. (*Id.*) The seventh of these grievances (Grievance Number GM-31041-00), also filed on November 17, 2000, regarded Plaintiff's request for medical attention. (*Id.; see also* Hearing Ex. P-13) The eighth of these grievances (Grievance Number GM-31048-00), filed on November 20, 2000, regarded the rotation of books. (Hearing Ex. D-14) The ninth of these grievances (Grievance

Number GM-31040-00), filed on November 27, 2000, regarded the review of records (and was consolidated with his earlier grievance on the same subject). (*Id.*) The tenth of these grievances (Grievance Number GM-31070-00), filed on November 27, 2000, regarded Plaintiff's eyeglasses. (*Id.*)

25    For example, Plaintiff was unable to identify the corrections officers to whom he handed his grievance and appeals for mailing. (*Id.* at 127-34.) Moreover, Plaintiff did not convincingly explain why the grievance and appeals at issue in this action did not make it through the mailing process, while his numerous other grievances and appeals did make it through the mailing process. (*Id.* at 154-171.) In addition, Plaintiff acknowledged that it was his belief, during this time period, that an inmate was not required to exhaust his administrative remedies in matters involving the use of excessive force; yet, according to Plaintiff, he decided to exhaust his administrative remedies on his excessive force claim anyway. (*Id.* at 148-49.)

26    *See Ruggiero v. County of Orange,* 467 F.3d 170, 178 (2d Cir.2006) (holding that defendants were not estopped from asserting the affirmative defense of non-exhaustion where the conduct plaintiff alleged kept him from filing a grievance-that he was not given the manual on how to grieve-was not attributable to the defendants and plaintiff "point[ed] to no affirmative act by prison officials that would have prevented him from pursuing administrative remedies"); *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *19 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) ("I have found no evidence sufficient to create a genuine issue of triable fact on the issue of whether Defendants, *through their own actions,* have inhibited Plaintiff exhaustion of remedies so as to estop one or more Defendants from raising Plaintiff's failure to exhaust as a defense.") [emphasis in original]; *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *16 (N.D.N.Y. Nov.5, 2007) (McAvoy, J. adopting Report-Recommendation of Lowe, M.J.) (finding defendants not estopped from raising Plaintiff's non-exhaustion as a defense based on plaintiff's allegation "that [he] was inhibited (through non-responsiveness) by [ ] unnamed officials at Coxsackie C.F.'s Inmate Grievance Program (or perhaps the Grievance Review Committee), and Coxsackie C.F. Deputy Superintendent of Security Graham" because plaintiff's complaint and "opposition papers ... fail to contain any evidence placing blame on Defendants for the (alleged) failure to address his grievances and complaint letters"); *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at *16 (N.D.N.Y. Apr.24, 2006) (Hurd, J. adopting Report-Recommendation of Lowe, M.J.) (finding that defendants are not estopped from relying on the defense of non-exhaustion because "no evidence (or even an argument) exists that any Defendant ... inhibit[ed] Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter."); *cf. Warren v. Purcell,* 03-CV-8736, 2004 WL 1970642, at *6 (S.D.N.Y. Sept.3, 2004) (finding that conflicting statements [offered by a non-party]-that the prisoner needed to refile [his grievance] and that the prisoner should await the results of DOCS's investigation-estopped the defendants from relying on the defense on non-exhaustion, or "[a]lternatively, ... provided ... a 'special circumstance' under which the plaintiff's failure to pursue the appellate procedures specified in the IGP was amply justified."); *Brown v. Koenigsmann,* 01-CV-10013, 2005 WL 1925649, at *1-2 (S.D.N.Y. Aug.10, 2005) ("Plaintiff does not assert that Dr. Koeingsmann personally was responsible for [the failure of anyone from the Inmate Grievance Program to address plaintiff's appeal]. [However,] *Ziemba [v. Wezner,* 366 F.3d 161 (2d Cir.2004) ] does not require a showing that Dr. Koenigsmann is personally responsible for plaintiff's failure to complete exhaustion [in order for Dr. Koenigsmann to be estopped from asserting the affirmative defense of failure to exhaust administrative remedies], as long as someone employed by DOCS is. If that reading of Ziemba is incorrect, however, ... then the circumstances here must be regarded as special, and as justifying the incompleteness of exhaustion, since a decision by CORC is hardly something plaintiff could have accomplished on his own.").

27    *See, e.g., Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "refusal to accept or forward plaintiff's appeals ... effectively render[s] the grievance appeal process unavailable to him").

28    The Court notes that, even if Plaintiff did (as he testified) hand to a corrections officer for mailing a letter to the Superintendent on September 13, 2000, appealing from the IGRC's failure to decide his grievance of August 22, 2000, within nine working days (i.e., by September 5, 2000), it appears that such an appeal would have been filed two days too late under DOCS Directive 4040, which requires that appeal to be filed within four working days of the IGRC's failure to decide his grievance (i.e., by September 11, 2000). (*See* Hearing Tr. 127-34; Hearing Ex. P-1, at 5-7 [attaching ¶¶ V.A, V.B. of DOCS Directive 4040, dated 6/8/98].)

**End of Document**                                                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4659327
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jeffrey A. NELSON, Plaintiff,

v.

Bruce PLUMLEY, et al., Defendants.

No. 9:12–CV–422.
|
Signed Sept. 17, 2014.

**Attorneys and Law Firms**

Jeffrey A. Nelson, Attica, NY, for Plaintiff.

Hon. Eric T. Schneiderman, New York State Attorney
General, Gregory Rodriguez, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

### DECISION and ORDER

THOMAS J. McAVOY, Senior District Judge.

**\*1** This *pro se* 42 U.S.C. § 1983 action was
referred to the Hon. David E. Peebles, Jr. United
States Magistrate Judge, for a Report–Recommendation
pursuant to 28 U.S.C. § 636(b). Magistrate Judge Peebles
recommends that the Defendants' motion for summary
judgment, dkt. # 49, be granted in part and that
the Court conduct an evidentiary hearing to determine
whether Plaintiff's failure to exhaust his administrative
remedies on his excessiveforce claim can be excused.
*See Dkt. # 59.* Plaintiff has filed objections to the
ReportRecommendation.

When objections to a magistrate judge's Report–
Recommendation are lodged, the Court reviews the record
*de novo. See* 28 U.S.C. § 636(b)(1). After such a review,
the Court may "accept, reject, or modify, in whole or
in part, the findings or recommendations made by the
magistrate judge. The Court may also receive further
evidence or recommit the matter to the magistrate judge
with instructions." *Id.* Thus, the Court reviews the instant
matter *de novo.*

Having reviewed the record *de novo* and having considered
the issues raised in the Plaintiff's objections, this Court
has determined to accept and adopt in part the
recommendation of Magistrate Judge Peebles for the
reasons stated in the ReportRecommendation. Therefore:

1. Plaintiff's objections, dkt. # 60, to the Report–
Recommendation of Magistrate Judge Peebles, dkt. # 59,
are hereby OVERRULED;

2. The Report–Recommendation is hereby ADOPTED;

3. The Defendants' motion for summary judgment, dkt.
# 49, is GRANTED in part and DENIED in part.
The motion is GRANTED with respect to Plaintiff's
Eighth Amendment conditions-of-confinement claim and
Fourteenth Amendment procedural due process claim.
The motion is DENIED with leave to renew with respect
to Defendants' claim that Plaintiff failed to exhaust
his administrative remedies on *all* of his claims. An
evidentiary hearing is necessary to determine whether
Plaintiff exhausted his administrative remedies with
respect to his remaining excessive-force claim against
Defendants Plumley and Spear. Defendants may renew
their motion following this hearing; and

4. The case is REFERRED to Magistrate Judge Peebles
to conduct an evidentiary hearing on exhaustion of
administrative remedies. The Magistrate Judge should
also consider Plaintiff's request to have counsel appointed
to represent him at that hearing.

IT IS SO ORDERED.

### REPORT AND RECOMMENDATION

DAVID E. PEEBLES, United States Magistrate Judge.

Pro se plaintiff Jeffrey A. Nelson, a New York State
prison inmate, has brought this action pursuant to
42 U.S.C. § 1983 alleging that several individuals
employed by or affiliated with the New York State
Department of Corrections and Community Supervision
("DOCCS") have deprived him of his civil rights. Plaintiff
contends that, while incarcerated, two of the defendants
used excessive force against him, two other defendants
subjected him to conditions of confinement tantamount
to cruel and unusual punishment, and a fifth defendant

denied him procedural due process during a disciplinary hearing.

**\*2** Now that discovery in the action has closed, defendants have moved for summary judgment dismissing plaintiff's claims. Defendants seek dismissal of two of plaintiff's claims based on his alleged failure to exhaust administrative remedies before filing suit, and contend that plaintiff's other claims lack merit. For the reasons set forth below, I recommend that plaintiff's conditions of confinement and due process claims be dismissed on the merits, and that an evidentiary hearing be conducted to determine whether plaintiff properly exhausted available administrative remedies in connection with his excessive force claim.

## I. BACKGROUND [1]

Plaintiff is a prison inmate currently in the custody of the DOCCS. *Dkt. No. 1 at 1.* While he is now incarcerated elsewhere, at the time of the relevant events Nelson was confined in a satellite unit of the Central New York Psychiatric Center ("CNYPC") in the Clinton Correctional Facility ("Clinton"), located in Dannemora, New York. *Id.* at 1, 4. Plaintiff suffers from mental illnesses, described by him as "depression, nervous panic attacks, ... and memory loss." *Id.* at 16.

On December 26, 2011, plaintiff was placed in the Residential Crisis Treatment Program ("RCTP") at Clinton for observation based upon a threat of self-harm. *Dkt. No. 50–1 at 2.* Upon entering an observation cell in the RCTP, plaintiff was provided with a specialized tear —and fire-resistant mattress, two tear-resistant mats, a specialized tear-resistant smock, soap, a toothbrush, and toothpaste.[2] *Id.*

Plaintiff alleges that, on January 3, 2012, while confined in his RCTP observation cell, he was involved in an altercation with defendants Bruce Plumley and Jeffrey Spear, both of whom are corrections officers at Clinton. *Dkt. No. 1 at 4–5; Dkt. No. 57–1 at 11–12.* Plaintiff alleges that he was assaulted by the two officers without provocation and, as a result, lost consciousness and suffered a concussion and laceration near his right eye requiring stitches. Dkt. No. 1 at 7; Dkt. No. 57–1 at 12–13. After being treated for his injuries by medical staff at Clinton, Nelson was returned to the RCTP observation cell without incident. Dkt. No. 49–6 at 2, 6.

As a result of the physical altercation, defendants Plumley and Spear each issued plaintiff separate misbehavior reports dated January 3, 2012. *Dkt. No. 1 at 13; Dkt. No. 49–3 at 2,* 9–10. Both misbehavior reports accused Nelson of failing to obey a direct order, assaulting a staff member, and engaging in violent conduct. *Dkt. No. 49–3 at 2,* 9–10. Beginning on or about January 9, 2012, Corrections Lieutenant John Miller, a defendant in this action, conducted a Tier III disciplinary hearing to address the charges contained in the misbehavior reports.[3] *Id.* at 3, 58–89. On or about January 20, 2012, following the close of the hearing, defendant Miller found Nelson guilty on all six counts, and imposed a penalty that included eighteen months of disciplinary confinement in a facility special housing unit ("SHU"), with a corresponding loss of telephone, package, and commissary privileges, and a recommendation that plaintiff lose twelve months of good time credits. *Id.* at 12, 88–89. Defendant Miller's determination was affirmed following review by D. Venettozzi, the DOCCS Acting Director of Special Housing/Inmate Disciplinary Program. *Id.* at 91.

**\*3** On January 3, 2012, the date of the alleged assault by defendants Plumley and Spear, the RCTP cells at Clinton were monitored by defendant Dr. Sohail Gillani,[4] a psychiatrist employed by the New York Office of Mental Health ("OMH") and assigned to the CNYPC satellite unit at Clinton. *Dkt. No. 50–1 at 1,* 3. On that date, according to defendant Gillani, he ordered that plaintiff be permitted only a smock in his cell after determining that plaintiff was at risk to himself, based upon his expression of suicidal ideation. *Id.* at 3. A "smock only" instruction meant that plaintiff would be provided only with a cloth smock comprised of heavy tear-resistant quilted material and designed to provide coverage and warmth to his body and reduce the risk of self-inflicted harm. *Dkt. No. 50–1 at 3.* In accordance with standard procedures applicable to observation cells in the RCTP, defendant Gillani's "smock only" order, and his corresponding instruction that plaintiff not be provided a blanket, were to be reviewed every twenty-four hours. *Id.* at 4. Accordingly, plaintiff was evaluated on January 4, 2012, by defendant Dr. Jean Berggren, another OMH psychiatrist assigned to the facility. Dkt. *No. 50 at 1,* 3. Based upon her observations, defendant Berggren discharged plaintiff from the RCTP on that date. *Id.* at 3–4.

Plaintiff, in some contrast, alleges that while confined in an RCTP observation cell after receiving medical treatment and meeting with defendant Gillani on January 3, 2012, he was left naked and "without a[ ] mattress, mats, smock, clothes, shoes, blanket, nor any shelter of warmth" for twenty-two hours in an "extremely cold cell." *Dkt. No. 1 at 9–10,* 13; Dkt. *No. 57–1 at 16.* In support of their motion, however, defendants have submitted evidence demonstrating that the temperatures in the CNYPC satellite unit, where the RCTP observation cells are located, are controlled by a Siemens computerized heating and cooling system designed to maintain a temperature of between 68 and 72 degrees Fahrenheit. *Dkt. No. 49–7 at 2.* The computers used in connection with the heating and cooling system are located in the main maintenance office at Clinton and a maintenance office located in the basement of Building 156, the building in which the CNYPC satellite unit is located. *Id.* Those computers are accessible only to maintenance workers at Clinton. *Id.* While there are thermometers in Building 156 that corrections officers and other staff members may use to verify and record temperatures, there are no manually adjustable thermostats located in the building to permit adjustment of the computer-controlled temperatures. *Id.* Accordingly, OMH employees have no ability to control ambient temperatures within the CNYPC satellite unit at Clinton. *Dkt. No. 50 at 4; Dkt. No. 50–1 at 4.*

Defendants have also submitted excerpts of logbook entries recording readings taken from thermometers located in the CNYPC satellite unit, and specifically the RCTP observation cell in which plaintiff was confined at the relevant times. *Dkt. No. 49–6 at 2.* According to those logbooks, the temperature recorded at the beginning of the 3:00 p.m. to 11:00 p.m. shift on January 3, 2012, was 70 degrees. *Dkt. No. 49–6 at 7.* At the beginning of the next shift, commencing at 11:00 p.m., the temperature was recorded at 72 degrees. *Dkt. No. 49–6 at 8.* At 6:55 a.m. on January 4, 2012, the temperature of the observation cells was recorded at 70 degrees. *Id.* at 9–10.

## II. *PROCEDURAL HISTORY*

**\*4** Plaintiff commenced this action on March 8, 2012. *Dkt. No. 1.* Plaintiff's complaint was accompanied by an application for leave to proceed *in forma pauperis* ("IFP"), a motion for preliminary injunction, and a request for appointment of counsel. Dkt. Nos. 2, 4, 5. Named as defendants in plaintiff's complaint are Corrections Officers Bruce Plumley and Jeffrey Spears;

Drs. Jean Berggren and S. Gillani; Joanne Waldron, a DOCCS mental health unit chief; Lester Wright, DOCCS Deputy Commissioner and Chief Medical Officer; and Corrections Lieutenant John E. Miller. *Dkt. No. 1* at 2–3. Following an initial review of plaintiff's complaint and IFP application, Senior District Judge Thomas J. McAvoy entered an order on June 1, 2012, granting plaintiff IFP status, denying his motions for a preliminary injunction and appointment of counsel, and approving the filing of Nelson's complaint subject to dismissal of his claim asserted against defendants Plumley and Spear for the alleged issuance of false misbehavior reports. *Dkt. No. 9.*

As a result of a subsequent dismissal motion filed by the defendants, my issuance of a report and recommendation concerning that motion, and a decision and order from Senior District Judge McAvoy, issued on March 18, 2013, adopting the report, plaintiff's claims have been further narrowed. Dkt. Nos. 25, 32, 34. By virtue of those decisions and plaintiff's subsequent filing of an affidavit abandoning any claims associated with the duration of his confinement arising from the disciplinary proceeding conducted by defendant Miller, *Dkt. No. 35,* the claims that remain pending are (1) an excessive force cause of action asserted against defendants Plumley and Spear; (2) a conditions of confinement claim asserted against defendants Berggren and Gillani; and (3) a procedural due process cause of action asserted against defendant Miller.

On November 25, 2013, following the close of discovery, defendants moved for the entry of summary judgment. *Dkt. No. 49.* In their motion, defendants request (1) dismissal of plaintiff's excessive force and conditions of confinement claims based upon his alleged failure to exhaust available remedies before commencing suit, and (2) dismissal of plaintiff's conditions of confinement and procedural due process claims on the merits. *See generally Dkt. No. 49–1.* Plaintiff has since responded in opposition to defendants' motion. Dkt. Nos. 55, 57. Defendants' motion, which is now fully briefed, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

**\*5** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4; *Sec. Ins. Co.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255; *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002); see also Anderson, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. *Exhaustion of Administrative Remedies*

In support of their motion, defendants contend that plaintiff is procedurally barred from pursuing his excessive force and conditions of confinement causes of action based upon his alleged failure to exhaust all available administrative remedies before commencing this action. *Dkt. No. 49–1 at 6–9.*

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo,* 548 U.S. 81, 84 (2006) ("Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley,* No. 04–CV–4587, 2007 WL 389003, at \*5–6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983."). [5] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). In the event the defendant establishes that the inmate plaintiff failed "to fully complete [ ] the administrative review process" prior to commencing the action, the plaintiff's complaint is subject to dismissal. *Pettus v. McCoy,* No. 04–CV–0471, 2006 WL 2639369, at \*1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95; *accord, Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007). [6]

**\*6** In accordance with the PLRA, the DOCCS has instituted a grievance procedure, called the Inmate Grievance Program ("IGP"), and made it available to inmates. The IGP is comprised of three steps that inmates must satisfy when they have a grievance regarding prison conditions. 7 N.Y.C.R.R. § 701.5; *Mingues v. Nelson,* No. 96–CV–5396, 2004 WL 234898, at \*4 (S.D.N.Y. Feb. 20, 2004). Embodied in 7 N.Y.C.R.R. § 701, the IGP requires that an inmate first file a complaint with the facility's IGP clerk within twenty-one days of the alleged occurrence. 7 N.Y.C.R.R. § 701.5(a) (1). If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. *Id.* A representative of the facility's inmate grievance resolution committee

("IGRC") has up to sixteen days after the grievance is filed to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. *Id.* at § 701.5(b) (2).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. *Id.* at § 701.5(c). The superintendent must issue a written decision within a certain number of days after receipt of the grievant's appeal. [7] *Id.* at § 701.5(c)(i), (ii).

The third and final step of the IGP involves an appeal to the DOCCS Central Office Review Committee ("CORC"), which must be taken within seven days after receipt of the superintendent's written decision. *Id.* at § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of the appeal. *Id.* at § 701.5(d)(2)(i).

Accordingly, at each step of the IGP process, a decision is rendered within a specified time period. Significantly, "[a]ny failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can—and must—be appealed to the next level, including CORC, to complete the grievance process." *Murray v. Palmer,* No. 03–CV–1010, 2010 WL 1235591, at *2 (N.D.N.Y. Mar. 31, 2010) (Hurd, J., *adopting report and recommendation by* Lowe, M.J.) (citing, *inter alia,* 7 N.Y.C .R.R. § 701.6(g)(2)).

Generally, if a plaintiff fails to follow each of the required three steps of the above-described procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *See Ruggerio v. Cnty. of Orange,* 467 F.3d 170, 176 (2d Cir.2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

In this case, plaintiff does not contend that he fully exhausted the available administrative remedies with respect to his excessive force and conditions of confinement claims. Rather, he maintains that his efforts to fully exhaust were thwarted by corrections officials at Clinton and at the Upstate Correctional Facility ("Upstate") following his transfer into that facility.

Because there is no record evidence to suggest that plaintiff did fully exhaust the administrative remedies, I have examined only whether plaintiff's failure to exhaust may be excused.

**\*7** In a series of decisions rendered since enactment of the PLRA, the Second Circuit has prescribed a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *See, e.g., Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004); *see also Macias,* 495 F.3d at 41. Those decisions instruct that, before dismissing an action as a result of a plaintiff's failure to exhaust, a court must first determine whether the administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. In the event of a finding that a remedy existed and was available, the court must next examine whether the defendants have forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through their own actions preventing the exhaustion of plaintiff's remedies, they should be estopped from asserting failure to exhaust as a defense. *Id.* If the exhaustion defense survives these first two levels of scrutiny, the court must examine whether the plaintiff has plausibly alleged special circumstances to justify his failure to comply with the applicable administrative procedure requirements. *Id.*

A review of the record in this case reveals a genuine dispute of material fact as to whether plaintiff's efforts to file grievances concerning the incidents at Clinton on January 3, 2012, were obstructed by DOCCS officials. According to plaintiff, he filed two grievances against defendants Plumley, Spear, Gillani, and Berggren while at Clinton on January 9, 2012, and January 10, 2012. *Dkt. No. 57– 1 at 2; Dkt. No. 55–3 at 2–3.* Although the photocopies of the grievances submitted by plaintiff in opposition to the pending motion are difficult to decipher, it appears that they contain allegations that he was subjected to excessive force and cold temperatures on January 3, 2012. *Dkt. No. 55–3 at 2–4.* Plaintiff alleges that he provided the two grievances, which were inside a sealed envelope, to an unidentified corrections officer at Clinton responsible for collecting the mail. *Dkt. No. 57–1 at 2.* According to plaintiff, Christine Gregory, the Inmate Grievance Program Supervisor at Clinton, "decline[d] to respond and did not process" his grievances filed in January. [8] *Id.* at 3.

In contrast to plaintiff's contentions, defendants have submitted an affidavit from Gregory, in which she states that there is no record at Clinton of plaintiff filing any grievances dated January 9, 2012, or January 10, 2012. *Dkt. No. 49–5 at 2.* Instead, Gregory notes that, on February 15, 2012, following plaintiff's transfer into Upstate, she received a letter from plaintiff requesting the status of the two grievances allegedly filed in January 2012, while he was still confined at Clinton. *Id.* Gregory responded to him by memorandum, advising him that there was no record of plaintiff filing grievances dated January 9, 2012, or January 10, 2012. *Dkt. No. 49–5 at 7.* She further advised plaintiff that any complaints must be processed through the IGP at Upstate, the facility in which he was then confined. *Id.*

**\*8** In apparent compliance with Gregory's instruction, on or about February 16, 2012, plaintiff attempted to file his grievances concerning the incident at Clinton on January 3, 2012, to Brandi White, the Inmate Grievance Program Supervisor at Upstate. *Dkt. No. 49–4 at 7–9.* In a cover letter, plaintiff advised White that he had attempted to file the grievances at Clinton but "that prison made the remedy unavailable by obstructing access to the grievance process." *Id.* at 7. Without addressing plaintiff's allegation of obstruction to the IGP at Clinton, White wrote plaintiff a memorandum, dated February 17, 2012, advising that his grievances submitted to her at Upstate were untimely, and, in accordance with DOCCS policies, she returned the grievances to plaintiff. *Id.* at 13. Plaintiff again attempted to file his grievances at Upstate on February 22, 2012, and White again rejected them as untimely.[9] *Id.* at 3, 15. In his affidavit submitted in opposition to the pending motion, plaintiff insists that Gregory and White "intentionally inhibited and obstructed [him] from using and availing himself of the facilities ['] administrative grievance program by not processing [his] two timely filed grievance complaints." *Dkt. No. 57–1 at 3.*

In light of the foregoing record evidence, I find that a dispute of fact exists as to whether special circumstances exist justifying plaintiff's failure to fully exhaust the available administrative remedies prior to commencing this action.[10] The Second Circuit has said that "non-exhaustion is an affirmative defense subject to estoppel in cases where prison officials inhibit an inmate's ability to utilize administrative grievance procedures." *Giano,* 380 F.3d at 677 (citing *Ziemba v. Wezner,* 366 F.3d

161, 163 (2d Cir.2004)). Although courts in this circuit have interpreted this holding to mean that only a named-defendant may be *estopped* from asserting the exhaustion defense,[11] other courts have extended the spirit of the holding by applying special circumstances where a non-defendant prison official interferes with an inmate-plaintiff's ability to file a grievance. *See, e.g., Murray,* 2010 WL 1235591, at \*6 (finding an allegation "that an unspecified number of unidentified corrections officers (who are not [named-defendants] ) somehow interfered with the delivery of [the plaintiff's] grievance and appeals ... could constitute special circumstances justifying an inmate's failure to exhaust his available administrative remedies in certain situations"); *Sandin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (finding that the plaintiff's allegation that a prison official's "refusal to accept or forward plaintiff's appeals ... effectively rendered the grievance process unavailable to [the plaintiff]" and would also constitute special circumstances). Because plaintiff has alleged that DOCCS officials (including the unidentified corrections officer at Clinton responsible for collecting mail, as well as Gregory and White) interfered with his ability to file the grievances concerning the incident at Clinton on January 3, 2012, and defendants have not provided the court with evidence to the contrary, I find that a dispute of material fact exists precluding the granting of defendants' motion with respect to their contention that plaintiff failed to exhaust the available administrative remedies prior to commencing this action. Accordingly, I recommend that the court conduct an evidentiary hearing to evaluate the issues of fact and assess plaintiff's credibility.[12] *See Messa v. Goord,* 652 F.3d 305, 310 (2d Cir.2011) ("[T]he Seventh Amendment does not guarantee a jury trial on factual disputes regarding administrative exhaustion under the PLRA.").

### C. *Conditions of Confinement*

**\*9** Although defendants seek dismissal of plaintiff's conditions of confinement claim, asserted against defendants Berggren and Gillani, based on plaintiff's failure to exhaust administrative remedies, they also contend the claim is ripe for dismissal on the merits. Specifically, defendants maintain that, based on the record evidence, no reasonable factfinder could conclude that plaintiff was subjected to cruel and unusual punishment under the Eighth Amendment. *Dkt. No. 49–1 at 7–13.* Defendants also contend that defendant

Berggren was not personally involved in the alleged constitutional violation, and defendant Gillani, who is allegedly responsible for plaintiff remaining naked in the RCTP observation cell for twenty-two hours, is entitled to qualified immunity from suit. *Id .* at 13–15.

The Eighth Amendment prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society [,]' or 'involve[s] the unnecessary and wanton infliction of pain [.]' " *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976) (quoting *Trop v. Dulles,* 356 U.S. 86, 100–01 (1958) and *Gregg v. Georgia,* 428 U.S. 153, 169–73 (1976) (citations omitted)). While the Eighth Amendment " 'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quoting *Rhodes v.. Chapman,* 452 U.S. 337, 349 (1981).) A claim alleging that prison conditions have violated the Eighth Amendment must satisfy both an objective and subjective requirement. *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996). As to the objective requirement, "the plaintiff must demonstrate that the conditions of his confinement result in 'unquestioned and serious deprivations of basic human needs.' " *Jolly,* 76 F.3d at 480 (quoting *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.2985)); *see also Walker v. Schult,* 717 F.3d 119, 125 (2d Cir.2013) ("To meet the objective element, the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health."). As to the subjective requirement, "the plaintiff must demonstrate that the defendants imposed those conditions with 'deliberate indifference,' " *Jolly,* 76 F.3d at 480 (quoting *Wilson v. Seiter,* 501 U.S. 294, 297 (1991)); *see also Waldo v. Goord,* No. 97–CV–1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J., *adopting report and recommendation by* Homer, M.J.). Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; [he] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837; *see also Waldo,* 1998 WL 713809, at *2; *Davidson,* 920 F.Supp. at 308.

Without question, exposure to extreme temperatures in a prison setting can constitute cruel and unusual punishment as proscribed under the Eighth Amendment. *See Benjamin v. Fraser,* 343 F.3d 35, 52 (2d Cir.2003), *overruled on other grounds by Caiozzo v. Koreman,* 581

F.3d 63 (2d Cir2009), (affirming the district court's conclusion that "exposure to extremes of temperature violated the detainees' constitutional rights"); *Gatson v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001) (finding that the plaintiff's allegation that he was exposed to freezing temperatures from November 1990 through March 1991 stated a claim under the Eighth Amendment; *Corselli v. Coughlin,* 842 F.2d 23, 27 (2d Cir.1988) (reversing the district court's grant of summary judgment where there was evidence that the plaintiff had been deliberately exposed to bitter cold in his cell block for three months).

**\*10** In this instance, plaintiff maintains that, by virtue of defendant Gillani's orders to DOCCS corrections officers, he was left naked in his RCTP observation cell and subjected to "extreme[ ] cold" for a period of "twenty-two hours" between January 3, 2012, and January 4, 2012. *Dkt. No. 1 at 9–10, 13; Dkt. No. 57–1 at 16.* In support of their motion for summary judgment, however, defendants have submitted evidence demonstrating that (1) the temperature in Building 156, where the CNYPC satellite unit is located, is controlled by a computer system located separate from the unit, and set to between 68 and 72 degrees at all times; (2) during the twenty-two hours in question, DOCCS corrections officers independently confirmed that the temperature in the unit was within the specified range; (3) only maintenance staff is authorized and able to access the computer system controlling the temperature in Building 156, and, accordingly, neither defendant Berggren nor defendant Gillani could have altered the temperature in plaintiff's cell; and (4) after he received medical treatment following the alleged assault by defendants Plumley and Spear, plaintiff expressed suicidal ideation to defendant Gillani, who subsequently issued an order that plaintiff be denied a blanket and anything other than a smock in order to prevent any attempted self-harm. *Dkt. No. 49–6 at 2,* 7, 8, 9–10; *Dkt. No. 49–7 at 2; Dkt. No. 50 at 4; Dkt. No. 50–1 at 4.*

While the court acknowledges the parties' conflicting accounts regarding the temperature in plaintiff's cell on January 3, 2012, and whether he was provided any clothing at all on that date, even assuming plaintiff's version of the events are accurate, I find that no reasonable factfinder could conclude that plaintiff was subjected to cruel and unusual punishment by defendants Berggren and Gillani. [13] *See Trammell v. Keane,* 338 F.3d 155, 164–65 (2d Cir.2003) (concluding that the plaintiff "no doubt" experienced uncomfortable conditions of confinement,

including, according to the plaintiff, being kept naked for a " 'prolonged period in bitter cold,' " but finding no constitutional violation where there was no evidence "that the cell in which he was housed was open to the elements, that it lacked adequate heat, or ... that the cell was 'bitter cold' "); *Flake v. Peck,* No. 12–CV–0517, 2014 WL 1289582, at *21 (N.D.N.Y. Mar. 31, 2014) (D'Agostino, J., *adopting report and recommendation by* Baxter, M.J.) (finding that the plaintiff's allegations that he was subjected to bitter cold in various cells from July 2010 until January 2011 was not sufficient to defeat the defendants' motion for summary judgment where the defendants had submitted evidence that the plaintiff was given one blanket when he asked for it and maintenance checked the temperature of his cells when he complained of the temperature); *Borge v. McGinnis,* No. 03–CV–6375, 2007 WL 1232227, at *5–6 (W.D.N.Y. Apr. 26, 2007) (dismissing the plaintiff's conditions of confinement claim where he alleged that, for three days, he was provided only a paper gown, paper slippers, and a thin mattress in a cell maintained at approximately fifty degrees). Moreover, plaintiff's mere allegations that he was left naked in an "extremely cold cell," without any supporting evidence, are insufficient to defeat defendants' motion, which includes evidentiary support demonstrating that plaintiff's RCTP observation cell was maintained at a reasonably warm temperature on January 3, 2012, and January 4, 2012. *See BellSouth Telecomm., Inc. v. W.R. Grace & Co.-Conn.,* 77 F.3d 603, 615 (2d Cir.1996) ("An adverse party may not rest upon mere conclusory allegations or denials. The party opposing the motion for summary judgment must set for concrete particulars. It is not sufficient merely to assert a conclusion without supplying supporting arguments or facts." (quotation marks, alterations omitted); *Wilson Jones v. Gilbert & Bennette Mfg. Co.,* 332 F.2d 216, 219 (2d Cir.1964) ("Mere conclusory affidavits that an issue exists no longer suffice to defeat well[-]grounded motions for summary judgment."). Accordingly, I recommend that the court grant defendants' motion for summary judgment with respect to plaintiff's conditions of confinement claim asserted against defendants Berggren and Gillani.

### C. *Procedural Due Process*

**\*11** Defendants also seek dismissal of plaintiff's due process claim, based on their contention that plaintiff received the full panoply of rights guaranteed under the Fourteenth Amendment during the Tier III disciplinary hearing conducted by defendant Miller. *Dkt. No. 49–1 at 16–21.*

Under the Fourteenth Amendment, a prison inmate who is deprived of a protected liberty interest must be afforded due process of law. [14] *Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996). The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well-established, and include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff v. McDonnell,* 418 U.S. 539, 564–69 (1974); *see also Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004). To pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination must garner the support of at least "some evidence." *Superintendent, Mass. Corr. Inst., Walpole v. Hill,* 472 U.S. 445, 455 (1985); *Luna,* 356 F.3d at 487–88.

The due process clause of the Fourteenth Amendment also guarantees that "[a]n inmate subject to a disciplinary hearing is entitled to ... an impartial hearing officer." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996) (citing *Wolff,* 418 U.S. 570–71). The Second Circuit has explained that its "conception of an impartial decisionmaker is one who, *inter alia,* does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990). "The degree of impartiality required of prison officials[, however,] does not rise to the level of that required of judges." *Allen,* 100 F.3d at 259. Indeed, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Russell v. Selsky,* 35 F.3d 55, 60 (2d Cir.1996). "A hearing officer may satisfy the standard of impartiality if there is 'some evidence in the record' to support the findings of the hearing." *Allred v. Knowles,* No. 06–CV–0456, 2010 WL 3911414, at *5 (W.D.N.Y. Oct. 5, 2010) (quoting *Hill,* 472 U.S. at 455).

Here, plaintiff alleges that he was denied due process when defendant Miller refused to call several witnesses requested by plaintiff, including defendants Berggren and Gillani, twenty-three other OMH staff, and the nurse that treated plaintiff following the alleged assault by defendants Plumley and Spear. *Dkt. No. 1 at 13–16; Dkt. No. 57–1 at 19–24.* According to plaintiff, those individuals may have witnessed the alleged assault. *Id.* Plaintiff also accuses defendant Miller of being impartial during the disciplinary hearing, and failing to afford him the opportunity to present a proper defense. [15] *Id.*

**\*12**  To refute plaintiff's allegations, defendants have submitted several documents related to the disciplinary hearing, including a full transcript of the hearing that commenced on January 9, 2012. *Dkt. No. 49–3 at 3.* Although plaintiff initially refused assistance in preparing for the hearing, once it commenced, he reconsidered and requested assistance. *Dkt. No. 49–3 at 15,* 61–62. Defendant Miller adjourned the hearing at that time to permit plaintiff to meet with his assistant and prepare a defense. *Dkt. No. 49–3 at 62.* The assigned assistant, A. Bezzio, met with plaintiff on January 10, 2012, and submitted a request for any unusual incident report concerning the altercation between defendants Plumley and Spear and plaintiff, as well as the opportunity to review the videotape recording of plaintiff's escort to medical personnel for treatment. *Dkt. No. 49–3 at 16.* The assistance form filed by Bezzio did not list any potential witnesses to be interviewed. *Id.*

At the continuation of the hearing, on January 18, 2013, although plaintiff requested testimony from two inmates who were confined in adjoining RCTP observation cells at the time of the alleged assault, those inmates refused to testify. *Dkt. No. 49–3 at 18–19,* 69–71. Defendant Miller reviewed the videotape depicting plaintiff's escort to the prison hospital following the incident, and then plaintiff testified in his own defense. *Id.* at 63–72. After determining that live testimony should be elicited from defendants Plumley and Spear, defendant Miller again adjourned the hearing. *Id.* at 70.

Plaintiff's Tier III disciplinary hearing resumed on January 20, 2012. *Dkt. No. 49–3 at 73.* During that session, defendants Plumley and Spear testified that the incident occurred in the RCTP observation cell area and there were no staff members other than themselves in the vicinity. *Dkt. No. 49–3 at 74–80.* Plaintiff's disciplinary hearing was again adjourned and resumed on January 23, 2012, based on plaintiff's request that Sergeant W. Bissell, the area supervisor on the date of the incident, be called to testify. *Dkt. No. 49–3 at 84–86.*

During the hearing, defendant Miller addressed plaintiff's request for additional unidentified witnesses and determined that no one was present during the incident, as alleged by plaintiff. Defendant Miller based his determination, in part, on the testimony of Sergeant Bissell, who stated that when he arrived after the incident, "there was nobody on that company." *Dkt. No. 49–3 at 86.* Defendant Miller also reviewed the logbook for the unit where plaintiff was housed on January 3, 2012, and concluded that no one had entered the area at or around the time of the incident, and up until after the incident. [16] *Id.* at 80–81. Although plaintiff requested the testimony of the nurse that treated him after the incident, defendant Miller denied that request because the nurse had not been present during the incident and therefore could not provide any relevant testimony. *Id.* at 87. At the conclusion of the hearing, defendant Miller provided plaintiff with a written disposition finding him guilty of all of the charges listed in the two misbehavior reports issued by defendants Plumley and Spear. *Id.* at 88–89. Defendant Miller based his findings based on several pieces of evidence, including the misbehavior reports authored by defendants Plumley and Spear, the unusual incident report, the use of force paperwork, employee injury reports and photos, the testimonies of defendants Plumley and Spear, and the testimony of OMH staff regarding plaintiff's mental health status at the time of the incident. *Id.*

**\*13**  In light of the foregoing evidence, I conclude that plaintiff was not deprived any due process. With respect to plaintiff's request to call two inmates that may have seen or heard the altercation on January 3, 2012, "[a] hearing officer has no power to force an inmate to testify, and when the inmate refuses, the hearing officer need not call that witness." *Dumpson v. Rourke,* No. 96–CV–0621, 1997 WL 610652 at \*5 (N.D.N.Y. Sept. 26, 1997) (Pooler, J., *adopting report and recommendation by* DiBianco, M.J.) (citing *Silva v. Casey,* 992 F.2d 20, 21–22 (2d Cir.1993)); *see also Wolff,* 418 U.S. at 568–69 (recognizing prison officials' discretion to call inmates as witnesses). In addition, defendant Miller's decision not to call plaintiff's treating nurse, as requested by plaintiff, was also reasonable. It is clear from plaintiff's testimony that the

nurse was not present during the alleged assault, and the record of plaintiff's injuries and treatment, coupled with the videotape reviewed by defendant Miller, adequately addressed their scope and extent. *See Wolff,* 418 U.S. at 566 (citing "lack of necessity" as a proper ground for refusing to call a potential witness at a disciplinary hearing). Defendant Miller's failure to call several other unidentified individuals to determine whether they had any additional information was also reasonable based on the testimonies of defendants Plumley and Spear and Sergeant Bissell, to the effect that no one else was present at the time of the altercation. *See Silva,* 992 F.3d at 21–22 ("[I]f a prison official, presiding over a prison disciplinary hearing, reasonably concludes that it would be futile to call a witness to testify, his refusal to do so will not constitute a violation of the prisoner's constitutional rights."). Finally, a careful review of the hearing record reveals that defendant Miller's determination was well supported by the evidence presented.

In sum, the record evidence in this case discloses that plaintiff was afforded the full extent of the procedural process due him under *Wolff* and its progeny, and no reasonable factfinder could conclude otherwise. Accordingly, I recommend dismissal of plaintiff's due process cause of action asserted against defendant Miller.

## IV. *SUMMARY AND RECOMMENDATION*
Defendants' arguments concerning plaintiff's alleged failure to exhaust available administrative remedies before commencing suit present issues of fact that must be addressed during an evidentiary hearing before the question of exhaustion can be decided by the court as a matter of law. Turning to the merits of plaintiff's conditions of confinement and due process claims, I conclude that no reasonable factfinder could find that plaintiff was exposed to conditions tantamount to cruel and unusual punishment or was denied procedural due process in connection with his Tier III disciplinary hearing. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (*Dkt. No. 49* ) be GRANTED, in part, and that plaintiff's Eighth Amendment conditions of confinement and Fourteenth Amendment procedural due process claims be DISMISSED; and it is further hereby

**\*14** RECOMMENDED that an evidentiary hearing be conducted pursuant to *Messa v. Goord,* 652 F.3d 305 (2d Cir.2011), to address whether, with respect to his Eighth Amendment excessive force claim, plaintiff's failure to exhaust administrative remedies prior to commencing this action may be excused.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Filed Aug. 13, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4659327

## Footnotes

1    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

2    Although plaintiff denies that he was provided with these amenities while in the observation cell, *Dkt. No. 57–1 at 16–17,* the parties' disagreement does not create a genuine dispute of material fact precluding the entry of summary judgment.

3    The DOCCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3; *see also* Hynes v. Squillace, 143 F.3d 653, 656 n. 1 (2d Cir.1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes,* 143 F.3d 655 n. 1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

4    The clerk is respectfully directed to modify the court's records to reflect the correct spelling of this defendant's name, as demonstrated in the declaration submitted in support of defendants' pending motion. *Dkt. No. 50–1 at 1.*

5    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

6    While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion " 'in a substantive sense,' " an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson v. Testman,* 380 F.3d 691, 697–98 (2d Cir.2004) (emphasis omitted)).

7    Depending on the type of matter complained of by the grievant, the superintendent has either seven or twenty days after receipt of the grievant's appeal to issue a decision. *Id.* at § 701.5(c) (i), (ii).

8    Plaintiff also alleges that, in addition to submitting the grievances through the IGP, he sent letters concerning the incidents on January 3, 2012, to the DOCCS Inspector General and other officials. *Dkt. No. 57–1 at 2–3.* As noted above, while placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion " 'in a substantive sense,' " an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson,* 380 F.3d at 697–98 (emphasis omitted)). Accordingly, to the extent that plaintiff submitted letters to DOCCS officials outside the formal IGP, those efforts are not relevant to the exhaustion analysis.

9    Notwithstanding White's insistence that "[g]rievances that are returned [to inmates] as untimely are not logged in at the grievance office with a date or grievance number" and that the grievances are "returned to the inmate," she attached copies of plaintiff's cover letter and grievances, each dated February 17, 2012, to her affidavit submitted in support of defendants' pending motion. *Dkt. No. 49–4 at 7–9.* White did not, however, attach a copy of the grievances submitted to her by plaintiff on February 22, 2012.

10    Plaintiff does not allege that the IGP was unavailable to him, nor does he contend that any of the named defendants attempted to thwart his efforts to process his grievances. Accordingly, the first two exceptions to the exhaustion rule under *Macias* and *Hemphill* are not applicable in this action. *See, e.g., Collins v. Caron,* No. 10–CV–1527, 2014 WL 296859, at *5–6 (N.D.N.Y. Jan. 27, 2014) (Suddaby, J.) ("A defendant in a prisoner civil rights action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies ... based on the actions or inactions of *other* individuals." (citing cases) (emphasis in original)).

11    *See, e.g., Collins,* 2014 WL 296859, at *5–6 (citing cases).

12    Because I recommend that plaintiff's conditions of confinement claim be dismissed on the merits, *see* Part III.C., *post,* however, during the evidentiary hearing, the court need only inquire into whether plaintiff is excused for failing to exhaust administrative remedies in connection with his excessive force claim asserted against Plumley and Spear.

13    In his affidavit, plaintiff also states that an unidentified corrections sergeant told him that he was secured in his cell without a mattress, mats, or a smock based on a " 'doctor[']s orders.' " *Dkt. No. 57–1 at 15–16.* Setting aside the fact that the identity of both the corrections sergeant and doctor referenced are unknown, the corrections sergeant's statement constitutes inadmissible hearsay. Consequently, plaintiff cannot be rely on the statement to create a genuine dispute of material fact. *See Burlington Coat Factory Warehouse Corp. v. Espirit de Corp.,* 769 F .2d 919, 924 (2d Cir.1985) ("[A party] cannot rely on inadmissible hearsay in opposing a motion for summary judgment."); *accord, Chansamone v. IBEW Local 97,* 523 F. App'x 820, 822 n. 4 (2d Cir.2013).

14    Because the penalty imposed by defendant Miller, following plaintiff's Tier III hearing, included eighteen months of disciplinary SHU confinement, plaintiff has satisfied the element of a due process claim requiring that he be deprived a protected liberty interest. *See Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000) (finding that, even under normal SHU conditions, confinement for more than 305 days implicates a prisoner's liberty interests); *accord, Palmer v. Richards,* 364 F.3d 60, 65 (2d Cir.2004).

15    Plaintiff also complains that his disciplinary hearing was not timely commenced. *Dkt. No. 1 at 16.* That argument, however, is based upon New York State regulations governing disciplinary hearings. *See, e.g.,* 7 N.Y.C.R.R. § 251–5.1. It is well settled, however, that "violations of state law that do not deprive the plaintiff of a right 'secured by the Constitution and laws' are insufficient to support a claim under [section] 1983." *Allred,* 2010 WL 3911414, at *5 (quoting *Baker v. McCollan,* 443 U.S. 137, 139–40 (1979)); *see also Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 (2d Cir.1990).

16    According to defendant Miller, anyone entering the unit, whether an employee or otherwise, is required to sign the logbook in accordance with facility policy. *Dkt. No. 49–3 at 6.*

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.